*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0091p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JEFFREY D. LUNDGREN,

        *Petitioner-Appellant,*

        *v.*

BETTY MITCHELL, Warden,

        *Respondent-Appellee.*

No. 02-3001

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 99-01268—Donald C. Nugent, District Judge.

Argued: December 8, 2005

Decided and Filed: March 13, 2006

Before: MERRITT, DAUGHTREY, and CLAY, Circuit Judges.

---

## COUNSEL

**ARGUED:** James A. Jenkins, Cleveland, Ohio, for Appellant. Charles L. Wille, ATTORNEY GENERAL'S OFFICE OF OHIO, CAPITAL CRIMES SECTION, Columbus, Ohio, for Appellee. **ON BRIEF:** James A. Jenkins, Cleveland, Ohio, Henry J. Hilow, McGINTY, GIBBONS, HILOW & SPELLACY, Cleveland, Ohio, for Appellant. Charles L. Wille, ATTORNEY GENERAL'S OFFICE OF OHIO, CAPITAL CRIMES SECTION, Columbus, Ohio, for Appellee.

     CLAY, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. MERRITT, J. (pp. 27-43), delivered a separate dissenting opinion.

---

## OPINION

---

     CLAY, Circuit Judge. Petitioner, Jeffrey D. Lundgren, an Ohio death row prisoner, appeals the November 14, 2001 order and judgment of the United States District Court for the Northern District of Ohio, denying his petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Petitioner was convicted in Ohio state court of five counts of aggravated murder with two death penalty specifications and five counts of kidnapping. The trial court followed the jury's recommendation and sentenced Petitioner to death. This Court certified for appeal Petitioner's claims relating to 1) the trial court's failure to allow the introduction of relevant mitigating evidence, 2) prosecutorial misconduct, and 3) ineffective assistance of counsel at the guilt and penalty phases.

For the reasons which follow, we **AFFIRM** the district court's denial of habeas corpus relief and **DENY** the petition.

**I.**

**BACKGROUND**

**A.  Substantive Facts**

Petitioner does not challenge the state courts' findings of fact.  Therefore, because of the deference due by this Court to state court factual determinations on habeas, we defer to the statement of facts as recited by the Supreme Court of Ohio upon direct review of Petitioner's conviction and sentence:

> *1.  Facts as Recited by the Ohio Supreme Court*
>
> *Lundgren's Background*
>
> Lundgren was born in Missouri and raised in the Reorganized Church of Jesus Christ of Latter Day Saints ("RLDS").  While attending college, Lundgren met and married his wife, Alice.  Unsuccessful in school, Lundgren joined the Navy and served in the Vietnam War in the early 1970s.  After his honorable discharge in 1974, he unsuccessfully held a series of hospital maintenance and other jobs in Missouri.
>
> Lundgren's religious beliefs form the foundation of this case.  Although the RLDS, headquartered in Independence, Missouri, differs from the Utah-based Mormon Church, both religions trace their origins to the prophet Joseph Smith, Jr., who published the Book of Mormon in 1830.  During the 1830s, Smith moved to Kirtland, Ohio, and built the Kirtland Temple, now managed by the RLDS.
>
> In summer 1984, Lundgren and his family moved from Missouri to Kirtland so that Lundgren could serve as senior temple guide, a job that had no pay but did include family lodging.  Lundgren initially attracted favorable attention in his Sunday school classes and as a guide.  William Russell, a religion professor at an RLDS college, testified that Lundgren knew scripture exceptionally well, especially the Book of Mormon, and followed the chiastic method of scripture interpretation, which involves searching text for recurring patterns.  However, Lundgren did not understand the Bible's historical context and tended to concentrate on this esoteric method.  Lundgren generally fit within the traditions of the RLDS faith in that he described visions, direct spiritual experiences, and God speaking directly to prophets.
>
> Over the next three years, Lundgren served as a temple guide and taught classes on the Bible and the Book of Mormon.  Despite the church's direction to turn over all money received from temple visitors to the church, Lundgren solicited and kept contributions received from visitors.  Temple contributions dropped dramatically, and the temple bookstore also suffered fund shortages.  The church eventually removed Lundgren as a religion teacher and, in October 1987, fired him as a temple guide and evicted him from his quarters next to the temple.

*The Cult*

From 1985 on, Lundgren attracted a substantial following in his classes because of his knowledge of religious texts. Eventually, Kevin Currie and Sharon Bluntschly moved in with the Lundgrens, as did Richard Brand, Daniel Kraft, and Gregory Winship. Debbie Olivarez joined the group in April 1988. Those living with the Lundgrens called him "Dad" and contributed their paychecks and other money for common group expenses. Two couples, Ron and Susan Luff and Dennis and Tonya Patrick, also contributed money, but did not live with the Lundgrens. In the spring of 1987, the Avery family moved from Missouri to follow Lundgren's teachings. The Avery family included Dennis, age 49; Cheryl, age 46; and their daughters, Trina, age 15; Rebecca, age 13; and Karen, age 7.

After Lundgren's eviction, he and his family and followers moved to a rented farmhouse. There, Lundgren continued his classes, stressing the importance of the Kirtland Temple. According to Lundgren, his followers had to recapture the temple, an earthquake would elevate it, and Christ would return and establish Zion. Lundgren also spoke of his conversations with God and his visions. He discussed the Book of Revelations and the Book of Mormon, and referred to "pruning the vineyard" and the need to kill ten followers before Zion could be created. Eventually, the men in the group undertook paramilitary training to prepare for a temple assault. Lundgren picked May 3, 1988 (his birthday) as the day to recapture the temple, but later decided it was not yet time. The Averys, on the fringe of the group, were invited to only a few of Lundgren's prayer meetings.

By October 1988, the RLDS church had excommunicated Lundgren. In early 1989, Lundgren was stressing the need for his followers to go on a wilderness trip before Zion would be possible. By that time, both Kevin Currie and another follower, Shar Olson, had left the group, but Kathryn and Larry Keith Johnson had joined.

*The Murders*

In April 1989, at Lundgren's direction, the group began preparing for the wilderness trip. Those who worked left their jobs and some bought provisions. Lundgren encouraged all of the followers to use up any of their available credit cards. All of the group members, including the Averys, gathered their worldly possessions. Around April 12, two or three of the followers secretly began digging a six-by-seven-foot pit in the dirt floor of Lundgren's barn. Lundgren told Cheryl Avery to write and tell her family that they were going to Wyoming. Then, Lundgren invited the Averys to dinner.

On April 17, 1989, Dennis, Cheryl and their three daughters ate dinner at Lundgren's farmhouse. After dinner, Lundgren went out to the barn with his son, Damon, and four followers, Brand, Kraft, Winship, and Ron Luff. The Averys stayed in the house with the women and children. At Lundgren's direction, Luff individually led each Avery family member out to the barn, where each was bound and gagged by the men. After the men placed each Avery family member into the pit, Lundgren shot each person two or three times with a .45 caliber semiautomatic weapon. The men then filled the pit with dirt and stones. Afterwards, Lundgren and the others went back to the farmhouse and held a prayer meeting.

*The Months Prior to Lundgren's Arrest*

The next day, April 18, police officers and FBI agents visited the Lundgren farm to investigate reports about the planned temple assault. Everyone interviewed said that they were at the farm voluntarily and denied knowing anything about plans to assault the temple. The FBI left without arresting anyone, and the group drove away on their wilderness trip.

Lundgren selected mountain campsites near Davis, West Virginia, and the group lived in tents there through October 1989. Some of the followers took jobs, and the men continued their military exercises. While in West Virginia, Lundgren chose Tonya Patrick as his second wife. That arrangement did not work out, so Lundgren then picked Kathryn Johnson as his second wife. That choice upset Larry Johnson, Kathryn's husband, and contributed to group dissension. By October 1989, Lundgren, his family, and about ten of his followers moved to Missouri. However, more dissension occurred and, by the end of December 1989, Larry Johnson had contacted federal law enforcement authorities about the murders.

On January 3, 1990, Kirtland police began digging out the pit in the barn and found Dennis Avery's body. Police uncovered the other Avery family members' bodies the next day. Lundgren had shot Dennis twice in the back and Cheryl three times in the torso. He shot Trina once in the head and twice in the body, Rebecca in the back and thigh, and Karen in the head and chest. The coroner found silver duct tape wrapped around the victims' heads, hands, and feet. The origin of two damaged bullets found at the scene was unknown. Police discovered that a .45 caliber semiautomatic weapon, belonging to Lundgren, had fired all of the other bullets they recovered. Lundgren bought the weapon in 1987 and sold it in West Virginia in October 1989. On January 7, 1990, federal authorities arrested Lundgren in California.

*Ohio v. Lundgren*, 653 N.E.2d 304, 304-06 (Ohio 1995).

2.       *Evidence Presented at the Sentencing Phase, as Recited by the Ohio Supreme Court*

As a youth, Lundgren was mostly a loner, but was active in sports and church activities. His father, a strict disciplinarian, enjoyed teasing and punishing him. Dr. Nancy Schmidtgoessling, a psychologist who testified for the defense, determined that Lundgren suffered from a mixed personality disorder with features of narcissism, paranoia, and antisocial traits. However, Lundgren's IQ of 124 was above average, and he was not schizophrenic or manic depressive. While growing up, Lundgren had little emotional support, and, as an adult, he developed intense feelings of grandiosity and a strong desire to control his environment. He could not maintain employment and "stole from almost" every one of his employers. Although Lundgren became obsessed with religion, at the time of the offenses, Lundgren did not have a mental disease or defect.

In an unsworn statement lasting almost five hours, Lundgren explained his lifelong search for spiritual truth and his visions. He quoted at length from the Old Testament and the Book of Mormon. Lundgren denied ever planning to take over the Kirtland Temple, but admitted killing the Averys. Lundgren asserted that he abhorred the sin he saw in the Avery family and explained that God commanded him to kill the Averys. He stated, "I cannot say that God was wrong. I cannot say that I am sorry I did what God commanded me to do in the physical act." Lundgren further explained, "I am a prophet of God. I am even more than a prophet. I am not a false prophet; therefore, I am not worthy of the [death] penalty." A rebuttal witness

confirmed that Lundgren had planned an armed attack on the temple. Other evidence established that the RLDS had fired Lundgren as a temple guide because of theft allegations.

*Id.* at 321.

## B. Procedural History

In 1990, an Ohio jury convicted Petitioner of five counts of aggravated murder and five counts of kidnapping. The murder counts included affirmative jury findings for two death penalty specifications. After a subsequent penalty trial, the trial court adopted the jury's recommendation of a death sentence on September 21, 1990. The Ohio Court of Appeals and the Supreme Court of Ohio affirmed Petitioner's conviction and sentence upon direct appeal. *See State v. Lundgren*, Nos. 90-L15-140, 91-L-036, 1993 Ohio App. LEXIS 4394 (Ohio Ct. App. Sept. 14, 1993), *aff'd*, 653 N.E.2d 304 (Ohio1995). Petitioner failed to secure post-conviction relief from state court. *See State v. Lundgren*, No. 97-L-110, 1998 Ohio App. LEXIS 6164 (Ohio Ct. App. Dec. 18, 1998), *juris. den'd*, 709 N.E.2d 171 (Ohio 1999).

Petitioner filed a petition for a writ of habeas corpus in federal district court in May 1999. The district court denied the petition without any evidentiary hearing and issued a blanket denial of Petitioner's claims for relief in November 2001. Petitioner appealed to this Court in December 2001. In February 2003, a panel of this Court vacated the decision of the district court and remanded the case for individual treatment of Petitioner's claims. Upon remand, the district court addressed each claim individually, denied all claims, and again denied a certificate of appealability as to all claims. This Court reversed the decision of the district court in part and granted a certificate of appealability on the above-named claims in June 2004.

## II.

## ANALYSIS

## A. Standard of Review

This Court reviews the decision of the district court to deny a petition for a writ of habeas corpus *de novo*. *Allen v. Yukins*, 366 F.3d 396, 399 (6th Cir. 2004).

Petitioner filed his petition for writ of habeas corpus in the district court after April 24, 1996; the Antiterrorism and Effective Death Penalty Act ("AEDPA") amendments to 28 U.S.C. § 2254 therefore apply in this case. *Coe v. Bell*, 209 F.3d 815, 822 (6th Cir. 2000). AEDPA "requires heightened respect for state court factual and legal determinations." *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). Section 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under § 2254(d)(1), a state court decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court decision is an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle but unreasonably applies that principle to the facts of the prisoner's case." *Id.* "'[C]learly established Federal law, as determined by the Supreme Court of the United States,' refers to 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Williams v. Bagley*, 380 F.3d 932, 942 (6th Cir. 2004) (quoting *Williams v. Taylor*, 529 U.S. at 412).

Moreover, the factual findings of a state court are presumed to be correct and can only be contravened if Petitioner can show by clear and convincing evidence that they are erroneous. *See* 28 U.S.C. § 2254(e)(1). The presumption of correctness also attaches to the factual findings of a state appellate court based on the state trial record. *See Sumner v. Mata*, 449 U.S. 539, 546-47 (1981).

## B.     Procedural Default Standard

Petitioner has procedurally defaulted a majority of the issues he raises on appeal. We therefore set forth the standard for procedural default here.

The Supreme Court has stated that "in all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal *habeas corpus review of the claims is barred* unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 749 (1991) (emphasis added). A federal habeas petitioner can procedurally default a claim by "failing to obtain consideration of a claim by a state court, either due to the petitioner's failure to raise that claim before the state courts while state-court remedies are still available or due to a state procedural rule that prevents the state courts from reaching the merits of the petitioner's claim." *Seymour v. Walker*, 224 F.3d 542, 549-50 (6th Cir. 2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1977)). When the state procedural rule prevents the state court from hearing the merits of the claim, procedural default occurs when 1) a petitioner failed to comply with the rule, 2) the state actually enforced the rule against the petitioner,[1] and 3) the rule is an "adequate and independent" state ground foreclosing review of a federal constitutional claim. *Willis v. Smith*, 351 F.3d 741, 744 (6th Cir. 2003). Failure to comply with well-established and normally enforced procedural rules usually constitutes "adequate and independent" state grounds for foreclosing review. *See id.* at 745.

A petitioner may avoid this procedural default only by showing that there was cause for the default and prejudice resulting from the default, or that a miscarriage of justice will result from enforcing the procedural default in the petitioner's case. *See Sykes*, 433 U.S. at 87. A showing of cause requires more than the mere proffer of an excuse. Rather, "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Habeas petitioners cannot rely on conclusory assertions of cause and prejudice to overcome procedural default; they must present affirmative

---

[1]This Court also requires that the state courts consistently enforce the rule, else a petitioner who fails to comply with the rule cannot predictably be said to have anticipated default of that ground.

evidence or argument as to the precise cause and prejudice produced. *See Tinsley v. Million*, 399 F.3d 796, 806 (6th Cir. 2005) (citing *Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 452 (6th Cir. 2003) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at a developed argumentation, are deemed waived.") (quotation marks omitted)).

In the absence of cause and prejudice, a petitioner may demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice. A fundamental miscarriage of justice results from the conviction of one who is "actually innocent." *Murray*, 477 U.S. at 496.

Petitioner failed to raise certain claims in his direct appeal in state court. The Ohio appellate court subsequently refused to address these issues on *res judicata* grounds upon Petitioner's collateral attack on his conviction and sentence in state court. For all of his procedurally defaulted claims, Petitioner has failed to argue any cause for his default to this court. These claims are discussed individually, *infra*.

## C.     The Presentation of Mitigating Evidence

### 1.     *Petitioner Has Procedurally Defaulted Certain Subclaims*

Petitioner has failed to preserve all his evidentiary claims for review by this Court. Petitioner has preserved subissues (a), (b), (c), and (d), *see infra*, by arguing them upon direct appeal and again to the state and district courts upon collateral review. *See Lundgren*, 653 N.E.2d at 319, 321. Petitioner, however, has failed to preserved subissues (e), (f), (g), (h), and (i), *infra*.

Petitioner argues that the trial court unconstitutionally denied him the opportunity to introduce mitigating evidence pieces (a) through (i):

(a)     The full nature and extent of the state's incentives given to accomplice Bluntchley to secure her testimony and her understanding of those benefits to cooperate. []

(b)     The full nature and extent of the state's incentives given to accomplice Olivarez to secure her testimony and her understanding of those benefits to cooperate. []

(c)     The full nature and extent of the state's incentives given to accomplice Brand to secure her testimony and her understanding of those benefits to cooperate. []

(d)     A jury view of the Kirtland Temple. []

(e)     Information that certain government witnesses were not truthful. []

(f)     That cooperating witness Olivarez and the Petitioner believed that "if Zion were to occur" no one would question the death of the Averys. []

(g)     That Petitioner's reasons for killing the Avery's were based upon his interpretation of scripture. []

(h)     That Petitioner attempted to conform his conduct to his interpretation of scripture. []

(i)       That cooperating witness Brand had given a prior inconsistent statement with respect to the manner of the death of Dennis Avery. []

(Pet. Br. 39.)  Of these subclaims, Petitioner argued only (a) through (d) on direct appeal.  The remaining subclaims (e) through (i) are procedurally defaulted.

The Ohio Court of Appeals found subclaims (e) through (i) barred on *res judicata* grounds because Petitioner failed to bring the claims in his direct appeal.[2] *Lundgren*, No. 97-L-110, 1998 Ohio App. LEXIS 6164, at *8-9.  This Court has found the Ohio courts' rule denying review of the merits in post-conviction proceedings when a petitioner could have, but failed, to raise a claim on direct appeal, to constitute "adequate and independent" state grounds foreclosing review in subsequent federal habeas proceedings.  *See Seymour*, 224 F.3d at 555 ("Ohio has a rule that claims must be raised on direct appeal if possible; otherwise, *res judicata* bars their litigation in subsequent state proceedings.").

Petitioner argues that the Ohio Supreme Court waived any procedural default that may have existed by conducting a plain error analysis on some of Petitioner's claims upon direct appeal, even though Petitioner had failed to preserve those claims through contemporaneous objections during trial.  Petitioner appears to believe that the plain error analysis indicates that the Ohio courts do not consistently enforce their *res judicata* rule, and therefore this Court should not rule any of Petitioner's claims procedurally defaulted because of the state courts' inconsistency. First, the Ohio Supreme Court's plain error review did not address, in any fashion, the evidentiary claims presented in subclaims (e) through (i) in this assignment of error.  Moreover, this Court has held that a state court's plain error analysis does not save a petitioner from procedural default.[3] *See Scott v. Mitchell*, 209 F.3d 854, 866 (6th Cir. 2000).  Plain error analysis is more properly viewed as a court's right to overlook procedural defects to prevent manifest injustice, but is not equivalent to a review of the merits.  *See id.* at 866-67.

Petitioner argues in the alternative that there is "ample proof that a number of [these subclaims] are supported by evidence outside of the record provided on direct appeal." (Pet. Reply Br. at 1.)  Petitioner fails, however, to elaborate on where this evidence is and to which subclaims it applies.  The only pages to the 10,000 page record which Petitioner references with respect to subclaims (e) through (i) contain witness testimony during Petitioner's guilt-phase jury trial. (*See* J.A. at 9560-64, 9901-02, 9904-06, 9910, 9913, 10052-57.)  Petitioner's evidentiary subclaims (e) through (i) relate to allegedly mitigating testimony that the trial court refused to allow Petitioner's counsel to introduce during the guilt-phase trial for various reasons.  *See* Part II.C.2, *infra*.  The record *provided* on direct appeal is distinct from the record *available* to Petitioner in forming the basis for his appeal.  The record is clear that Petitioner and his counsel knew of the  allegedly

---

[2]The Ohio courts have two variants of *res judicata* for collateral attacks on convictions.  The first variant, and the source of procedural default here, is when a petitioner could have, but failed, to bring a claim on direct review.  Ohio courts, however, also preclude on collateral attack any claims that were *actually brought and litigated* on direct appeal. *See Lundgren*, No. 97-L-110, 1998 Ohio App. LEXIS 6164, at *9.  This second variant of *res judicata*, of course, cannot serve as the basis of procedural default, because a petitioner's failure to comply with a state procedural rule does not give rise to the bar.  *See Seymour*, 224 F.3d at 555.

[3]Petitioner relies on an unpublished, *per curiam* decision of this Court for the proposition that an appellate court's plain error analysis of an otherwise procedurally defaulted claim precludes a finding by this Court that the state court imposed the rule in Petitioner's case.  (*See* Pet. Reply Br. 6 (citing *Knuckles v. Rogers*, No. 92-3208, 1993 U.S. App. LEXIS 1403, at *9-10 (6th Cir. Jan . 21, 1993) (*per curiam*) (unpublished opinion).)  This Court's unpublished decision in *Knuckles*, however, is not binding on future panels of this Court, *see* Sixth Circuit Rule 206 (2004), and because the proposition is contrary to United States Supreme Court precedent, it could not be the law in any event, *see Coleman*, 501 U.S. at 741 (finding reservation of plain error review insufficient grounds to rule against finding procedural default).

mitigating evidence (and indeed attempted to introduce it at trial) and could have used that knowledge as a basis for review upon direct appeal.

Petitioner argues in the alternative that Petitioner's ineffective assistance of counsel excuses his default. This Court has held that constitutionally defective representation does constitute cause for excusal from procedural default. *See Willis*, 351 F.3d at 745. But Petitioner does not claim ineffective *appellate* counsel, and the basis of Petitioner's default on subclaims (e) through (i) arises from Petitioner's failure to raise these issues on direct appeal, not any failure by Petitioner's trial counsel, for example, to proffer contemporaneous objections. Petitioner's invocation for this Court's use of the "miscarriage of justice" gateway (*see* Pet. Reply Br. 7) also fails because Petitioner has not offered evidence that he was "actually innocent" or that but for the failed objections, the results of the sentencing phase would have been different.

2.      *Petitioner Was Not Unconstitutionally Denied an Opportunity to Present Relevant Mitigating Evidence*

a.      *Evidentiary rulings (a), (b), and (c) did not prevent Petitioner from presenting relevant mitigating evidence*

In his preserved subclaims (a), (b), and (c), Petitioner argues that the trial court improperly circumscribed the cross-examination of state witnesses Bluntschly, Olivarez, and Brand, preventing Petitioner's trial counsel from eliciting from the witnesses the full extent of their plea agreements with the government and thereby inappropriately limiting the admission of mitigating evidence. In particular, Petitioner alleges that defense counsel was unable to develop:

(a)      The full nature and extent of the state's incentives given to accomplice Bluntchley to secure her testimony and her understanding of those benefits to cooperate. []

(b)      The full nature and extent of the state's incentives given to accomplice Olivarez to secure her testimony and her understanding of those benefits to cooperate. []

(c)      The full nature and extent of the state's incentives given to accomplice Brand to secure her testimony and her understanding of those benefits to cooperate. []

(Pet'r Br. 39.) Bluntschly, Olivarez, and Brand had been members of Petitioner's cult, were charged as accomplices to Petitioner's crimes, and pursuant to plea bargains with the state, testified during the *guilt phase* of Petitioner's trial. These accomplices did *not* testify during the mitigation phase.

"In a capital case the sentencer [may] not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Mills v. Maryland*, 486 U.S. 367, 374 (1988). The rule of *Mills*, however, applies to the penalty phase of Petitioner's trial, and not the guilt phase. Petitioner had ample opportunity to present his believed connection between his religious beliefs and the Averys' deaths, an opportunity he took during the penalty phase of his trial, giving a lengthy unsworn statement to the connection. *See Lundgren*, 653 N.E.2d at 321.

Moreover, even were the above witnesses testifying during the penalty phase, Petitioner has failed to establish that further cross-examination of his accomplices about the plea arrangements would have elucidated mitigating evidence. Rather, the supposedly precluded evidence went toward witness bias and credibility, not Petitioner's character, background, or circumstances of the crime. *Mills*, 486 U.S. at 374. In any event, at trial, Petitioner's counsel enjoyed sufficient latitude to

establish the fact of a plea agreement for each witness, the fact that substantial charges had been dropped against each witness in exchange for their testimony against Petitioner, and the minimum and maximum sentences for each witness under their plea agreement. The trial court precluded defense counsel, however, from questioning the accomplices about when they might be eligible for parole under their plea arrangements or potential downward departures by each witness' ultimate sentencing judge (inasmuch as none of the witnesses had actually been sentenced yet.)

Petitioner does not argue to this Court how a more thorough cross-examination of his three accomplices as to potential, but speculative, reductions in their plea-bargained sentences would have constituted mitigating evidence. Certainly, such evidence would go to the credibility of the witnesses, but ample testimony as to the plea arrangements had been elicited to permit the jury to consider the accomplices' motives in testifying and their attendant veracity.

In addressing Petitioner's claims with respect to these accomplices' cross-examinations, the Supreme Court of Ohio found that:

> Lundgren argues the trial court unfairly restricted the cross-examination of his accomplices concerning the full benefits of their plea arrangements. In fact, the trial court allowed cross-examination of Bluntschly, Olivarez, and Brand regarding their plea agreements, including questions about the offenses originally charged, the offenses to which each witness pled guilty, the conditions of the plea arrangements, and the maximum sentences to be recommended under the plea bargains. The trial court, however, did not allow counsel to mischaracterize the plea agreements or cross-examine the accomplices on speculative issues such as their possible probation or parole.
>
> "The scope of cross-examination and the admissibility of evidence during cross-examination are matters which rest in the sound discretion of the trial judge." *O'Brien v. Angley* (1980), 63 Ohio St.2d 159, 163, 17 O.O.3d 98, 100, 407 N.E.2d 490, 493; Evid. R. 611(A). Here, we determine that no abuse of discretion occurred, since Lundgren had a full opportunity to demonstrate the bias or prejudice of each of these accomplices. Moreover, we find that any possible error would be harmless beyond a reasonable doubt in view of the overwhelming evidence demonstrating Lundgren's guilt.

*Lundgren*, 653 N.E.2d at 319.

> With respect to these same claims, on habeas review the district court found that:
>
> Petitioner fails to explain how the incentives given to accomplices may be construed as relevant mitigating evidence much less how exclusion of this evidence contributed to the imposition of the sentence of death . . . . [T]he transcript unequivocally shows the jury heard evidence regarding the "incentives" given to the witnesses . . . . The Trial Court specifically limited defense counsel's questions concerning whether []Bluntschly and []Olivarez, could receive a term of probation or a lesser sentence pursuant to a plea agreement . . . [T]he reason for this limitation was because the Trial Court believed a sentence of probation was too speculative.

*Lundgren v. Mitchell*, No. 1:99 CV 1268 (N.D. Ohio Nov. 14, 2001) (opinion and order).

An independent review of the record confirms the Supreme Court of Ohio and the district court's assessment of the record at trial. We therefore conclude that Petitioner has failed to show that counsel's restrictions upon cross-examination of these three accomplices precluded the

introduction of any mitigating evidence.  Accordingly, the district court did not err in denying habeas relief on these grounds.

> b.          *Evidentiary ruling (d) did not prevent Petitioner from presenting relevant mitigating evidence*

Petitioner takes issue with the district court's refusal to allow a jury view of the Kirtland Temple before the presentation of evidence during the penalty phase.  Petitioner requested this view for the purpose of "allow[ing] the jury to better comprehend the testimony to be presented and the context of the physical setting in which the events took place."  (J.A. at 2216-17.)  The trial court denied the view because "no evidence was adduced at the guilt/innocence phase . . . which the defense could reasonably allege that any material fact occurred at the *situs* of the requested jury view."  (J.A. at 2242.)

Petitioner has failed to show how this view of the Kirtland Temple would have adduced mitigating evidence.  Petitioner presents no argument in his brief to this Court (nor, apparently, to the district court) about how the viewing would have been mitigating.  Moreover, Petitioner submitted ample evidence as to his religious beliefs during the penalty phase of the trial.  *See Lundgren*, 653 N.E.2d at 321.  Accordingly, Petitioner was not precluded from submitting evidence going to his "character or record and any of the circumstances of the offense," *Mills*, 486 U.S. at 374, by the court's refusal to allow a jury view of the Kirtland Temple.

> 3.          *Summary*

Petitioner has failed to show that any relevant mitigating evidence was precluded from the jury's consideration during the penalty phase of his trial.  Almost all Petitioner's evidentiary claims go to testimony during the guilt-phase of his trial.  Claims respecting rulings (e) through (i) have been procedurally defaulted.  For nondefaulted claims (a) through (c), Petitioner has failed to show how permitting cross-examination of Petitioner's accomplices as to speculative, and admittedly unlikely, aspects of their plea arrangements would have adduced mitigating evidence when the jury had heard ample testimony as to the nature and extent of each plea agreement.  Finally, Petitioner has failed to show how the trial court's refusal to permit a jury view of the Kirtland Temple (ruling (d)) precluded the introduction of mitigating evidence.

## D.     Effective Assistance of Counsel

> 1.          *Petitioner Has Procedurally Defaulted Certain Subclaims*

Petitioner has successfully preserved only some of his ineffective assistance of counsel subclaims.  In his thirteenth claim for relief to the Ohio Court of Appeals, Petitioner alleged ineffective assistance of counsel due to counsel's failure to proffer a meaningful defense upon the entry of a not guilty by reason of insanity plea and by providing corroborating expert testimony in support of that defense and/or its use as a mitigating factor.  The Ohio Court of Appeals addressed this issue on the merits, despite the fact that Petitioner did not raise the issue on direct appeal, concluding that the claim involved evidence beyond the trial record.  *See Lundgren*, No. 97-L-110, 1998 Ohio App. LEXIS 6164, at *13-14.  Therefore, this claim is not procedurally defaulted.

In his fourteenth claim for relief, Petitioner alleged ineffective assistance of counsel due to counsel's failure to raise a series of nine objections to evidence during trial (numbered (a) through (i), below).  Petitioner raised only three of these nine instances upon direct appeal ((e), (f), and (g)).  On collateral review, the Ohio Court of Appeals held all of Petitioner's claims based on non-objections to evidence barred by *res judicata*.  *Lundgren*, No. 97-L-110, 1998 Ohio App. LEXIS 6164, at *13.  For procedural default in this Court, however, only those claims which Petitioner failed to bring on direct review and which were subsequently barred are deemed procedurally

defaulted.  Therefore, subclaims (a), (b), (c), (d), (h), and (i) are procedurally defaulted, but subclaims (e), (f), and (g) are preserved for review.

In his twentieth claim for relief, Petitioner alleged ineffective assistance of counsel because of counsel's failure to investigate and/or file motions to suppress evidence found from a warrantless search of the barn which Petitioner had been renting and in which the Averys' bodies were found. Petitioner did not raise this claim on direct appeal, and the Ohio Court of Appeals found the claim barred by *res judicata*.  *See Lundgren*, No. 97-L-110, 1998 Ohio App. LEXIS 6164, at *13. Therefore, this claim is procedurally defaulted.

Petitioner may overcome his procedural default only by showing cause for the default and prejudice to his case as a result of counsel's ineffectiveness.[4]  Here, Petitioner has not argued that his counsel's performance on direct appeal was ineffective.  Nor has Petitioner presented any cause for his appellate counsel's failure to bring his twentieth claim for relief or subclaims (a), (b), (c), (d), (h), and (i) under his fourteenth claim for relief on direct appeal.  Therefore, Petitioner has failed to overcome his procedural default on these subclaims.

### 2.          *Clearly Established Federal Law on Constitutionally Defective Counsel*

The Supreme Court first articulated the now-familiar two-part test for determining whether counsel is ineffective in *Strickland v. Washington*, 466 U.S. 668 (1984), and "[i]t is past question that the rule set forth in *Strickland* qualifies as clearly established Federal law, as determined by the Supreme Court of the United States."  *Williams v Taylor*, 529 U.S. at 390.  Under *Strickland*, to show that his counsel's assistance was ineffective, Petitioner bears the burden in showing 1) that his counsel's performance was deficient, in other words, that it "fell below an objective standard of reasonableness," and 2) that Petitioner was prejudiced by the attorney's deficient performance. *Strickland*, 466 U.S. at 687-88.

The Supreme Court has established an objective test for the deficiency prong: "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness," as judged by "prevailing professional norms."  *Id.* at 687-88.  "Indicia of objective unreasonableness include the violation of 'certain basic duties' inherent in the representation of a criminal defendant, among them a 'duty of loyalty' to the client, from which derive 'the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution.'"  *Rickman v. Bell*, 131 F.3d 1150, 1154 (6th Cir. 1997) (quoting *Strickland*, 466 U.S. at 688).  In assessing deficient performance, reviewing courts must take care to avoid "second-guessing" strategic decisions that failed to bear fruit.  *Id.* at 689.

If Petitioner is successful in proving deficient performance, Petitioner must then show that counsel's constitutionally deficient performance prejudiced Petitioner.  Petitioner "need not show that counsel's deficient conduct more likely than not altered the outcome in the case," rather, only that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  Ohio is a "weighing" state, which means that the aggravating circumstances must outweigh the mitigating factors in order to impose the death penalty.  Under federal law, one juror may prevent the death penalty by finding that mitigating factors outweigh aggravating factors.  As the Supreme Court recently said in *Wiggins*, the "prejudice" prong is satisfied if "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 523-28 (2003).

---

[4]Given the overwhelming evidence presented in Petitioner's case, including the fact that Petitioner admitted to shooting the Averys, Petitioner cannot prevail on the fundamental miscarriage of justice prong.

In determining whether prejudice has resulted from counsel's errors, a court "must consider the totality of the evidence before the jury. . . . [A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 695.   In making this determination as to prejudice, this Court examines the combined effect of all acts of counsel found to be constitutionally deficient, in light of the totality of the evidence in the case.  *See, e.g.*, *Blackburn v. Foltz*, 828 F.2d 1177, 1186 (6th Cir. 1987).  If Petitioner fails to prove either deficiency or prejudice, then Petitioner's ineffective assistance of counsel claims must fail.  *Strickland*, 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.")

Capital defense counsel has an affirmative duty to pursue mitigation evidence and to conduct an appropriate investigation into potential mitigating factors:

> Counsel's constitutional duty to investigate a defendant's background in preparation for the sentencing phase of a capital trial is "well-established." *Coleman v. Mitchell*, 268 F.3d 417, 449 (6th Cir. 2001); *see also Austin v. Bell*, 126 F.3d 843, 848 (6th Cir. 1997).  The "prospect of being put to death unless counsel obtains and presents something in mitigation" magnifies counsel's responsibility to investigate. *Mapes v. Coyle*, 171 F.3d 408, 426 (6th Cir. 1999).  And notwithstanding the deference *Strickland* requires, neither this court nor the Supreme Court has hesitated to deem deficient counsel's failure to fulfill this obligation. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 523-28 . . . (2003) (concluding that counsel's failure to expand their investigation of the defendant's personal background, which included physical and sexual abuse, beyond the presentence investigation and Department of Social Services reports constituted constitutionally deficient performance); *Williams v. Taylor*, 529 U.S. 362, 395 . . . (2000) (finding counsel's failure "to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood" deficient); *Carter v. Bell*, 218 F.3d 581, 596-97 (6th Cir. 2000) (concluding that defense counsel's failure to investigate the defendant's family, social, or psychological background "constituted representation at a level below an objective standard of reasonableness").

> Accordingly, "our principal concern in deciding whether [counsel] exercised reasonable professional judgment is . . . whether the investigation supporting counsel's decision not to introduce mitigating evidence of [Harries's] background was itself reasonable." *Wiggins*, 539 U.S. at 522-23 (internal quotations and citations omitted).  "In assessing counsel's investigation, we must conduct an objective review of their performance, measured for 'reasonableness under prevailing professional norms.'" *Id.* at 523 (quoting *Strickland*, 466 U.S. at 688) . . . . More recent ABA Guidelines, which the United States Supreme Court has recognized as reflecting prevailing professional norms, emphasize that "investigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins*, 539 U.S. at 524 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases § 11.4.1 (C), p. 93 (1989) and adding emphasis).

*Harries v. Bell*, 417 F.3d 631, 637-638 (6th Cir. 2005).

3.          *Defense Counsel Was Not Deficient in Failing to Assert a Not Guilty by Reason of Insanity Defense*

Petitioner alleges that his trial counsel's failure to assert a not guilty by reason of insanity defense was constitutionally defective performance. Petitioner states in his brief to this Court that his trial counsel "failed to obtain an appropriate expert to offer testimony about [Petitioner's] state of mind at the time at which these offenses occurred." (Pet'r Br. 46.) Petitioner then puts forth legal argument that criminal defendants are entitled to mental health experts and cites case law in support of this contention. (Pet'r Br. 47-49, citing *Ake v. Oklahoma*, 470 U.S. 68, 71 (1985) ("The State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination . . . .").) Petitioner argues that Petitioner's trial counsel failed to "ask for and secure an expert [as] contemplated by *Ake*." (Pet'r Br. 48.)

Petitioner is correct in that a counsel's failure to explore the possibility of a not guilty by reason of insanity defense through reasonable investigation, including the use of a qualified mental health expert, can rise to the level of constitutionally defective counsel. *Strickland*, 466 U.S. at 690-91("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."); *see also Power v. Collins*, 332 F.3d 376 (6th Cir. 2003) (holding that capital defendant is entitled to mental health expert during guilt and penalty phases); *Sims v. Livesay*, 970 F.2d 1575, 1580 (6th Cir. 1992). Here, however, the only conclusion supported by the record before this Court is that defense counsel *did* secure appropriate mental health experts and *did* make an adequate investigation into Petitioner's mental state and background well before the criminal trial.

Petitioner's trial counsel requested and received funding for two clinical psychologists, Dr. Newton Jackson and Dr. Nancy Schmidtgoessling. Petitioner has a constitutional right to only one mental health expert. *See Ake*, 470 U.S. at 71. Records submitted to the court indicate that these psychologists each evaluated Petitioner well before Petitioner's August 1990 guilt-phase trial. These same records show that the psychologists met with Petitioner's defense counsel in *advance* of trial and *after* each had evaluated Petitioner. Moreover, both mental health experts interviewed people from Petitioner's background, including immediate family members.

Counsel's diligence in obtaining not just the constitutionally mandated single mental health expert, but two mental health experts, shows that counsel engaged in a reasonable investigation into Petitioner's mental state at the time of the crimes. Counsel's decision not to pursue an insanity defense must be understood as a strategic one, absent any compelling evidence to the contrary. Given that defense counsel did call Dr. Schmidtgoessling during the penalty phase to testify to Petitioner's mental condition, but that Dr. Schmidtgoessling admitted, on cross-examination, that she should could not reach a conclusion that Petitioner was not sane at the time of his crimes, Petitioner has no substantive grounds on which to claim that trial counsel's strategic choice was unreasonable.[5]

To the extent that Petitioner's argument can be framed as one impugning the competency of the psychologists retained to assist trial counsel, Petitioner's argument has little merit. The Constitution does not require that an indigent criminal defendant be able to retain the expert of his

---

[5]To the extent that Petitioner's argument can be framed as counsel's failure to procure a mental health expert whose *conclusions were favorable* to Petitioner, Petitioner's claim must also fail. Petitioner does not have a constitutional right to an expert whose conclusions favor Petitioner. *See Ake*, 470 U.S. at 83. Moreover, to the extent that two psychologists being paid through defense counsel could not conclude that Petitioner was insane, counsel's decision to discontinue pursuit of that line of defense was a reasonable one.

choosing, only that a competent expert be made available. *See Ake*, 470 U.S. at 83. A licensed practitioner is generally held to be competent, unless counsel has good reason to believe to the contrary. *Cf. Skaggs v. Parker*, 235 F.3d 261, 268 (6th Cir. 2000) (finding defense counsel's reliance on expert during penalty phase unreasonable in light of expert's highly unusual and eccentric behavior during guilt phase). Here, Petitioner presents no evidence that Dr. Jackson and Dr. Schmidtgoessling were incompetent. Instead, Petitioner submits an affidavit of Ph.D. psychologist Jeffrey Smalldon who opines that Petitioner "should have been seen as eligible . . . for a defense of not guilty by reason of insanity." (J.A. at 121.) The question before this Court, however, is not whether all mental health experts would agree on whether the defense was viable, but whether counsel's decision not to pursue the defense was a reasonable strategic choice. "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 125 S. Ct. 2456, 2463 (2005).[6]

Given counsel's information at the time of trial, there is no evidence to support the conclusion that counsel's decision was unreasonable.

As to the penalty phase of Petitioner's trial, Petitioner's claim for ineffective assistance with respect to the use of mental health experts must similarly fail. Contrary to Petitioner's contention, defense counsel did submit mitigating psychological evidence to the extent possible. Defense counsel placed Dr. Schmidtgoessling on the stand. Dr. Schmidtgoessling testified to Petitioner's difficult family background, the unusual forms of discipline Petitioner had been subjected to as a child, and the emotional abuse Petitioner had been subjected to by his parents. Dr. Schmidtgoessling testified that Petitioner's religious beliefs affected his perception of reality, and that she diagnosed Petitioner with mixed personality disorder with the dominant features being narcissism, paranoia, and anti-social tendencies. Dr. Schmidtgoessling further testified that, in her opinion as a psychologist, Petitioner "really believed . . . that it was right to kill these folks because he believed that God commanded him to do so." (J.A. at 10836.) It may be inferred, however, from Dr.

---

[6]Although the dissent argues that Petitioner's counsel's failure to present the defense of insanity at trial amounted to ineffective assistance of counsel, there is actually nothing in the record to support reliance on an insanity defense. In support of its argument, the dissent cites the diagnosis of Dr. Jeffrey L. Smalldon; however, Dr. Smalldon's testimony never actually provides a definitive diagnosis that Petitioner was insane at the time of the crimes. Rather, Dr. Smalldon indicated that he regards Petitioner as delusional and psychotic "such that [Petitioner] should have been seen as eligible at the time of his 1990 trial for a defense of not guilty by reason of insanity." (J.A. at 121.) Ironically, Dr. Smalldon offers this legal conclusion after criticizing Dr. Schmidtgoessling's conclusion that "I don't believe he was insane" as a "legal, as opposed to psychological opinion, something she was not qualified to give." (J.A. at 121).

The dissent has canvassed the legal literature and concluded that Petitioner's counsel's failure to present a defense of insanity at the time of Petitioner's trial constituted ineffective assistance of counsel because that defense, in the opinion of the dissent, was the only one available to Petitioner that might have permitted him to escape the death penalty. Although it is true, as the dissent points out, that there are reported cases in which a "deific decree" was presented as the basis for an insanity defense, the defense has been successful only four times (or seven times, as the dissent counts the cases) and has never been successful in Ohio. Consequently, there can be no contention that the defense has been utilized frequently enough, or successfully enough, that the failure to assert the defense constitutes ineffective assistance of counsel without reference to such factors as whether the Petitioner regarded himself as insane and whether he was willing to have such a defense presented on his behalf (according to Dr. Smalldon, Petitioner was lucid and did not regard himself as insane, *see, e.g.*, J.A. at 94), and without considering such circumstances as matters of strategy or even the straightforward belief by Petitioner and/or his counsel that Petitioner was not insane no matter how delusional or religiously-motivated Petitioner may have been in committing the murders.

The dissent's own discussion reveals that a defense of "deific decree" has never been successful under the circumstances of Petitioner's case, *i.e.*, where there was no mental health expert able to testify to the defendant's insanity, despite counsel's diligent investigation into the defense as required under *Ake*. The success of the dissent's argument would appear to rest on the contention that Petitioner's counsel had a duty to explore the insanity defense *beyond* the reasonable reliance on the findings of the two mental health experts already hired, neither one of whom could say that Petitioner was insane under Ohio law. Yet counsel had no reason to doubt his experts' capabilities or conclusions. The dissent's conclusion that counsel's investigation was unreasonable contradicts the Supreme Court's holding that, even in capital cases, a defendant is entitled to only one qualified mental health expert at the expense of the state, even if the conclusions of that expert fail to favor the defense. *See Ake*, 470 U.S. at 71, 83.

Schmidtgoessling's conclusion that Petitioner was not "insane," that in her view Petitioner's delusional thinking did not rise to the legal definition of insanity under Ohio law.

Given the absence of a factual basis for Petitioner's claim, the state court's conclusion that defense counsel was not ineffective for its failure to present an insanity defense cannot be said to be contrary to or an unreasonable application of federal law.

> 4. *Defense Counsel Was Not Ineffective in Failing to Object to Particular Pieces of Evidence*

In his fourteenth claim for relief, Petitioner alleged ineffective assistance of counsel due to counsel's failure to raise a series of nine objections at trial. The objects of the nonobjections are as follows:

(a)  Evidence of the character of the victims, even though their character was not at issue.

(b)  Evidence as to what the prosecutor told the police to do as it related to the search and recovery of the victims' bodies, which had the effect of bolstering the witness' testimony and establishing the appearance of conducting a search in conformity with the law.

(c)  A witness' mentioning of "Jonestown." (J.A. at 9579.)

(d)  Expert opinions that were not stated in terms of probability.

(e)  Demonstrative use and admission of numerous firearms and other materials unconnected to the death of the Averys.

(f)  Use of the victims' decayed clothing with attached body "parts," resulting in the prejudicial introduction of offensive odors, and testimony as to the Averys' stomach contents. (J.A. at 10106-27.)

(g)  Testimony concerning "other acts evidence" not related to or similar to the offenses at bar.

(h)  Prosecutorial recitation of facts not in evidence during closing argument.

(i)  Prosecutorial argument that the defense "sanitized" and "whitewashed" the case. (J.A. at 10351.)

(Pet'r Br. 55.)

As analyzed *supra*, subclaims (a), (b), (c), (d), (h), and (i) are procedurally defaulted, and Petitioner has failed to overcome his default. Only subclaims (e), (f), and (g) are preserved for our review.

> a. *Counsel's failure to object is not usually deficient performance*

As a threshold matter, in a trial of any size, numerous potentially objectionable events occur. "[T]he Constitution does not insure that defense counsel will recognize and raise every conceivable constitutional claim." *Engle v. Isaac*, 456 U.S. 107, 134 (1982). Moreover, experienced trial counsel learn that objections to each potentially objectionable event could actually act to their party's detriment. Learned counsel therefore use objections in a tactical manner. In light of this, any single failure to object usually cannot be said to have been error unless the evidence sought is so

prejudicial to a client that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice. *See Hodge v. Hurley*, 426 F.3d 368, 376 (6th Cir. 2005) ("[C]ounsel's failure to object to *any* of the numerous improper statements in the prosecution's closing argument is well outside [professional norms].") (emphasis in original).[7]

> b.      *Petitioner fails to show how any alleged errors by counsel prejudiced Petitioner*

Even assuming, *arguendo*, that Petitioner is able to prove that it was error for counsel to fail to object to the above-referenced evidence, Petitioner has failed to show how 1) the failure to object to any of the enumerated instances amounts to a constitutional deprivation of counsel, and 2) how Petitioner was prejudiced by the admission – *i.e.*, why this Court should find that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Petitioner is not entitled to a presumption of prejudice unless it can be said that his counsel "fail[ed] meaningfully to oppose the prosecution's case." *Florida v. Nixon*, 543 U.S. 175, 179 (2004).

Petitioner presents no argument in support of the prejudice prong beyond Petitioner's conclusory assertions that the cumulative effect of the errors denied Petitioner his right to effective assistance of counsel. The evidence of Petitioner's guilt was overwhelming. Petitioner admitted to shooting the Averys. Accomplices testified against Petitioner and provided details of the crimes. Coroner's evidence corroborated the accomplices' testimony. Forensic evidence further corroborated the accomplices' accounts. In the penalty phase, Petitioner himself did not disclaim the acts, but merely asserted that his actions were not wrong because God's will directed them. In light of this overwhelming evidence, it is difficult to conclude that there exists a reasonable probability that but for the alleged errors, the result of either the guilt or penalty phases would have been different.

---

[7]This Court in *Hodge* found repeated and pervasive prosecutorial misconduct, to which defense counsel *never* objected:

> To review, the prosecutor accused the Hodge of "lying"; stated that the complaining witness was "absolutely believable"; accused Dr. Steiner of testifying "wrongfully" and "unethically," and telling "a lie"; stated that defense counsel was telling "a lie"; severely misrepresented the testimony of Dr. Omley, the examining physician; stated (incorrectly) that a finding in favor of Hodge required a finding that Fenn's great-grandmother and great-aunt were "absolute liars"; suggested (without any evidence) that Hodge was a frequent underage drinker; insinuated (without any evidence) that Hodge wanted to get part of the prosecutor's family's Social Security checks; suggested that Hodge was the type of person the jury should fear running into at night; and generally argued that the jury should convict Hodge on the basis of his bad character.

> With the exception of certain of the bad-character arguments, these statements are harmful to Hodge's case precisely because they are false, unsupported, or misleading, rather than because they are true but inadmissible. As to the bad-character arguments, they were sufficiently egregious to warrant, at a minimum, an objection at the bench following the conclusion of the prosecution's rebuttal argument. We are unable to articulate a sound professional reason why defense counsel did not object to this pattern of repeated misconduct, and accordingly we must conclude that counsel's failure to object was "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

*Hodge*, 426 F.3d at 386.

c.      *The Supreme Court of Ohio's decision was not an unreasonable application*
        *of federal law*

Petitioner has preserved for review his allegations of ineffective assistance of counsel due to counsel's failure to object to the firearms evidence (subclaim (e)), the victims' clothing (subclaim (f)), and "other acts" evidence (subclaim (g)).

Petitioner argues that his trial counsel should have objected to the state's introduction of firearms evidence which was "unconnected to the death of the Averys." Petitioner further contends that his trial counsel should have objected to the presentation of the Averys' putrified clothing in the courtroom. Finally, Petitioner argues that defense counsel should have objected to the testimony of an Officer Alvord that revealed that Petitioner had been under investigation for plans to assault the Kirtland Temple.

On direct review, the Ohio Court of Appeals found that the court did not commit plain error by allowing the firearms and ostensible "other acts" evidence into the trial, concluding that while the firearms (and presumably the testimony going to the planned assault) were of "questionable relevance," Petitioner had failed to establish that but for the disputed evidence, "the results of the guilt or penalty phases would have been otherwise." *Lundgren*, No. 90-L-15-140, 1993 Ohio App. LEXIS, at *19-20. The Ohio Supreme Court agreed, summarily finding that Petitioner was not prejudiced by the admission of the evidence under the plain error standard. *See Lundgren*, 653 N.E.2d at 318.

Petitioner argues that his trial counsel should have objected to the prosecution's use, in court, of the Averys' clothing as visual exhibits of where bullets penetrated. The clothing, recovered from the buried bodies of the Averys, was accompanied by a "pungently acrid" smell.

Both the Ohio Court of Appeals and the Ohio Supreme Court failed to treat separately each evidentiary subclaim under Petitioner's ineffective assistance of counsel assignment of error. Instead, the courts concluded generally that even were Petitioner able to prove counsel erred in failing to proffer objections, Petitioner had failed to prove prejudice. *See Lundgren,* No. 90-L-15-140, 1993 Ohio App. LEXIS 4394, at *91-92; *Lundgren*, 653 N.E.2d at 324. In addition, the Ohio Supreme Court observed:

> Lundgren's counsel vigorously and professionally defended his client in an unpopular cause. As a part of that strenuous defense, counsel could make tactical choices. Lundgren's trial strategy was to concede that he shot the Averys, but argue he did not deserve the death penalty, given his sincere religious motives. Under the facts, the decision not to object to issues raised in propositions of law five, six, seven, eight, nine, eleven, thirteen, fourteen, twenty-one, twenty-two, and twenty-three did not fall below an objective standard of reasonableness.

*Lundgren*, 653 N.E.2d at 324 (internal quotation and citation omitted).

The district court found the firearms evidence admissible as relevant to a finding of prior calculation and design and therefore concluded that counsel did not err in failing to object to their admission. In addition, the district court found that Agent Alvord's testimony revealing suspicion of Petitioner's plans to assault the Temple was admissible because it was admitted in the context of the agent's testimony tending to reveal that Petitioner was packed and ready to move and therefore had prior calculation and design to kill the Averys and then quit the area. Finally, the district court concluded that the clothes were properly admitted to show that their defects were consistent with the testimony as to the victims' gunshot wounds.

The Ohio Supreme Court's conclusion cannot be said to be either "contrary to" nor an "unreasonable application" of the *Strickland* test. The evidence against Petitioner going to guilt was undisputed, and the basic elements of the crime – the planning and execution of a family of five – are strong aggravating factors in and of themselves. Petitioner does not support in briefs to this Court how, without the above evidence,"there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Petitioner's argument under these subclaims must fail.

> 5.      *Summary*

Petitioner has procedurally defaulted his claims of ineffective assistance of counsel as premised on victim character evidence, the mention of Jonestown, the use of "certainty" language, the warrantless barn search, the wiretap, and prosecutorial misconduct. Without argument as to cause for his failure to bring these issues up on direct appeal, Petitioner cannot overcome this procedural default.

Petitioner's non-defaulted claims show no grounds for habeas relief premised on ineffective assistance of counsel. Petitioner's trial counsel had ample reason for not bringing an insanity defense and had performed a reasonable investigation into Petitioner's mental state and background. Moreover, the state court's determination that Petitioner failed to prove prejudice from the introduction of the victims' clothing, the firearms evidence, and Petitioner's Temple assault plans was not contrary to nor an unreasonable application of federal law.

## E.      Prosecutorial Misconduct

> 1.      *Petitioner Has Procedurally Defaulted Certain Subclaims*

Petitioner has failed to preserve the bulk of his prosecutorial misconduct claims for review. Petitioner argues that the prosecutor denied him a fundamentally fair trial by doing the following:

(a)      continually asking leading questions,

(b)      improperly vouching for the credibility of government witnesses,

(c)      continually questioning witnesses regarding Petitioner's character,

(d)      arguing that the defense "sanitized" and "whitewashed" the case, and that it had prevented the jury from looking at the true facts in the case (J.A. at 10351),

(e)      arguing that defense counsel "knew that they were had" (J.A. at 10352),

(f)      arguing that the jury should consider the "terror the victims experienced" (J.A. at 10354),

(g)      arguing facts not in evidence by stating that Petitioner looked into the eyes of Karen Avery before he shot her,

(h)      exhorting the jury to return a guilty verdict so Petitioner could "suffer the consequences" (J.A. at 10360),

(i)      commenting adversely on the unsworn nature of Petitioner statement during the penalty phase,

(j)      appealing to the juror's sense of community to take vengeance on Petitioner, and

(k)      coercing a potential defense witness.

(*See* Pet'r Br. 58-59).

Of these subclaims, Petitioner has preserved only subclaims (i) and (k) by arguing them on direct appeal.  Petitioner raised the remainder of his subclaims for the first time on collateral attack in state court.  On collateral review, the Ohio Court of Appeals held all of Petitioner's claims based on prosecutorial misconduct barred by *res judicata*.  *Lundgren*, No. 97-L-110, 1998 Ohio App. LEXIS 6164, at \*13.  For procedural default in this Court, however, only those claims which Petitioner failed to bring on direct review and which were subsequently barred are deemed procedurally defaulted.  Therefore, subclaims (i) and (k) are preserved for review, while the remaining subclaims are procedurally defaulted.

Here, Petitioner has not argued that his counsel's performance on direct appeal was ineffective.  Nor has Petitioner presented any cause for his appellate counsel's failure to bring his prosecutorial misconduct subclaims (a), (b), (c), (d), (e), (f), (g), (h), and (j) on direct appeal. Therefore, Petitioner has failed to overcome his procedural default on these subclaims.

### 2.        *Prosecutorial Misconduct Legal Standard*

On habeas review, "the relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "Even if the prosecutor's conduct was improper or even universally condemned, we can provide relief only if the statements were so flagrant as to render the entire trial fundamentally unfair." *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003).  Reversal is required only if the prosecutor's misconduct is "so pronounced and persistent that it permeates the entire atmosphere of the trial or so gross as probably to prejudice the defendant." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997); *see also Gall v. Parker*, 231 F.3d 265, 311 (6th Cir. 2000), *overruled on other grounds sub nom Bowling*, 344 F.3d at 501 n.3.  If a court does find a constitutional error in the sentencing phase, the court must then ask whether the constitutional error influenced the jury's decision between life and death.

The Supreme Court has advised that isolated statements of a prosecutor's argument,

> like all closing arguments of counsel, are seldom carefully constructed *in toto* before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear.  While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.

*Donnelly*, 416 U.S. at 646-47.  This Court has further instructed courts to consider:

> the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury and the strength of the competent proof to establish the guilt of the accused.

*Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982) (*en banc*).  This Court has refused to find a prosecutor's prejudicial comments to constitute misconduct when the behavior was not so "fundamentally unfair as to deny [the defendant] due process based on the totality of the

circumstances." *Hamblin v. Mitchell*, 354 F.3d 482, 495 (6th Cir. 2003) (internal quotations and citations omitted).[8]

Under AEDPA, this bar is heightened by the deference this Court must grant to the Ohio Supreme Court's rulings on Petitioner's nondefaulted prosecutorial-misconduct claims. *See Bowling*, 344 F.3d at 513; *see also Macias v. Makowski*, 291 F.3d 447, 453-54 (6th Cir. 2002) ("If this court were hearing the case on direct appeal, we might have concluded that the prosecutor's comments violated Macias's due process rights. But this case is before us on a petition for a writ of habeas corpus. So the relevant question is not whether the state court's decision was wrong, but whether it was an unreasonable application of clearly established federal law.").

### 3.     *Petitioner's Allegation Under Subclaim (k) Has No Basis in Fact*

Petitioner argues in subclaim (k) that the prosecutor improperly coerced a defense witness (a coconspirator) by threatening to review the unindicted status of the witness if the person testified for the defense. Petitioner presents no evidence of this charge, however, nor makes any argument as to what type of testimony this witness was prevented from supplying. Moreover, this coconspirator did testify for the defense, precluding a finding of prejudice or that the alleged coercion denied Petitioner a fundamentally fair trial.

### 4.     *The Prosecutor's Comments Under Subclaim (i) Were Improper, But Did Not Prejudice Petitioner*

#### a.     *The Prosecutor's comments were improper*

The Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 615 (1965).

Ohio Revised Code, Section 2929.03(D)(1) grants the defendant in a capital proceeding the right to make an unsworn statement at the penalty stage. The Ohio Supreme Court has found that:

> to permit the prosecutor to extensively comment on the fact that the defendant's statement is unsworn affects Fifth Amendment rights and negates the defendant's statutory prerogative. However, to totally restrict the prosecutor from making any comment would likewise be unfair, especially where the defendant, in his unsworn statement, has offered something less than "the truth, the whole truth and nothing but the truth." Therefore . . . where the defendant chooses to make an unsworn statement in the penalty stage of a capital trial, the prosecution may comment that the defendant's statement has not been made under oath or affirmation, but such comment must be limited to reminding the jury that the defendant's statement was not made under oath, in contrast to the testimony of all other witnesses.

*State v. DePew*, 528 N.E.2d 542, 554 (Ohio 1988).

The prosecutor made repeated references to the unsworn nature of Petitioner's testimony and invited the jury to draw negative conclusions from Petitioner's failure to testify under oath during either his guilt or penalty phase trials. In reviewing the mitigating or aggravating evidence in the case, the prosecutor always referred to Petitioner's statement as his "unsworn statement." The prosecution made six such references during its initial closing argument. In its rebuttal closing

---

[8] The *Hamblin* panel found a prosecutor's repeated references to numerous blows received by a victim, when the evidence adduced only one blow, both improper and prejudicial, but not prosecutorial misconduct. 354 F.3d at 495.

argument, the prosecution did much more than merely refer to Petitioner's statement as "unsworn." The prosecution invited the jury to draw a negative inference from the fact that Petitioner's statement was unsworn. The argument initially went as follow:

> The other problem with [Petitioner's] statement yesterday, ladies and gentlemen, is, you heard the Judge remarks about it, you have heard [the other prosecuting attorney] mention it, that statement yesterday was not given under oath. Now, is it because the Defendant is not familiar with an oath?

(J.A. at 11259.)

At this point defense counsel objected. A sidebar ensued, in which the prosecutor argued that Ohio law permitted comment on the unsworn nature of a defendant's capital sentencing phase statement. Over defense counsel's objection, the trial court permitted the prosecutor's comment on the unsworn nature of Petitioner's statement, but cautioned counsel to avoid "undue emphasis." (J.A. at 11261.) The prosecution then continued to the jury:

> Ladies and gentlemen, during the course of testimony, during the post-phases of the trial, the indication to you that the Defendant made Kevin Currie swear an oath and if he violated that oath, he was to die. He had the naked dancing women swear an oath as they returned to their husbands with their soiled undergarments and he had their humiliated husbands swear an oath of allegiance to him dressed in full military gear after the conclusion of that dancing ceremony.

> Ladies and gentlemen, the statement given by the Defendant yesterday, the prophet of God, you heard an oath administered by Judge Parks to each and every witness who came into this courtroom[;] that is they swore and/or affirmed that the testimony that I am going to give to you, the jury, is the truth as you shall answer to God.

> The Defendant, ladies and gentlemen, did not take such an oath. You are permitted, ladies and gentlemen, to consider that fact as you consider his testimony.

(J.A. at 11261-62.)

> ### b.     *The improper statements under subclaim (i) do not amount to reversible error*

A prosecutor's comment on a defendant's silence is improper and may rise to the level of prosecutorial misconduct requiring reversal on appellate review. *See Griffin*, 380 U.S. at 615. A reviewing court need not reverse a sentence or verdict, however, if it finds that the comment amounted to harmless error beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24 (1967). An error may be harmless when the state presents an otherwise "compelling case of guilt" and a review of the record as a whole shows that the jury verdict would have been the same. *See United States v. Hasting*, 461 U.S. 499, 511 (1983).

In *Chapman*, the Supreme Court reversed the California high court because of a prosecutor's repeated references to the defendants' silence. *Chapman*, 386 U.S. at 25-26. Pursuant to California law, the prosecutor implied that the jury could draw an inference for the state on any fact which would have been within the defendant's personal knowledge. *Id.* at 26-42. In fact, the prosecution's closing argument was structured almost entirely around defendants' refusal to testify. *Id.* To compound the injury, but also pursuant to California law, the trial court also instructed the jury that it could draw negative inferences from the defendants' silence on matters within the defendants' personal knowledge. *Id.* at 25-26. The Supreme Court held that, in a case where "fair-minded jurors might very well have brought in not-guilty verdicts," the emphasis on defendants' silence made it

impossible to say "that the prosecutor's comments and the trial judge's instructions did not contribute to petitioners' convictions." *Id.* at 26.

In *DePew*, the Ohio Supreme Court found a prosecutor's comments, although improper, harmless "in light of the overwhelming weight of the aggravating circumstances in this case relative to the factors offered in mitigation" *DePew*, 528 N.E.2d at 554. The prosecutor had commented:

> [T]he gentleman for the defendant, he told you five different times about the oath you took, and about the oath we all take, and the oath I take, and the oath you take – everybody takes the oath except the defendant; he isn't man enough to get up here and take the oath. Everybody in this case took the oath. Everybody in this case raised his right hand to this man, and he says I solemnly swear to tell the truth, the whole truth and nothing but the truth so help me God. Everybody except DePew.

*Id.*

This Court later granted a conditional writ of habeas corpus to the state prisoner in *DePew* because the prosecution's comments on the prisoner's unsworn statement, when combined with the prosecutor's numerous misleading and inflammatory comments throughout trial and during closing arguments, had the effect of impugning, without proper evidence, the prisoner's sole mitigation theory before the jury. *DePew v. Anderson*, 311 F.3d 742 (6th Cir. 2002) ("Cumulatively, it is clear these errors are not harmless.")[9]

The Ohio Supreme Court found the prosecution's repeated reference to the unsworn statement improper. *See Lundgren*, 653 N.E.2d at 323. The court, however, concluded that the statements were harmless error because "the aggravating circumstances in this case strongly outweighed any mitigating factors beyond a reasonable doubt." *Id.* The Ohio Supreme Court referenced its independent sentence assessment for its conclusion. *Id.*; *see infra.* This holding reflected the finding of the lower Ohio Court of Appeals, which also found the statements improper, but harmless in light of the "overwhelming aggravating circumstances in this case relative to the mitigating factors." *Lundgren*, No. 90-L-15-140, 1993 Ohio App. LEXIS at *31.

Under Ohio Rev. Code § 2929.05(A), the Ohio appellate courts are required to "independently weigh" the aggravating circumstances against the mitigating factors:

> The court of appeals and the supreme court shall review the judgment in the case and the sentence of death imposed by the court or panel of three judges in the same manner that they review other criminal cases, except that *they shall review and independently weigh all of the facts and other evidence* disclosed in the record in the

---

[9]The state supreme court found numerous improper statements by the prosecution:

> The prosecutor in this case openly declared at a pretrial hearing that he did not care whether appellant received fair treatment. Later the prosecutor informed the jury of an alleged knife fight, which was not in evidence, and implied thereby that appellant was guilty of wrongdoing, of which there was absolutely no evidence. Further, the prosecutor commented to the jury on a subsequent conviction of appellant, unsupported by any evidence in the record, and then [after being admonished by the trial judge, who had previously warned against mention of such] told the jury that no such conviction existed. The prosecutor then exhibited and commented on a totally irrelevant photograph depicting appellant next to a marijuana plant. Further, the prosecutor, in his closing remarks at the penalty stage, told the jury that "it's not necessarily true that if you get three counts of twenty to life that it will add up to sixty – that's not necessarily true." While this does not involve a total misstatement of the law (see R.C. 2967.13[D] and [E]), it certainly could be construed as misleading.

*DePew*, 528 N.E.2d at 556.

case and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case, and whether the sentence of death is appropriate.

(emphasis added).  Pursuant to § 2929.05(A), the Ohio Supreme Court independently reexamined the aggravating and mitigating factors in Petitioner's case and affirmed the sentence of death.  *See Lundgren*, 653 N.E.2d at 324-25.  The Ohio Supreme Court determined:

> After independent assessment pursuant to our duties under R.C. 2929.05, we determine that the evidence supports the aggravating circumstances of which Lundgren was found guilty beyond a reasonable doubt. Now, we must also weigh the facts and evidence in the record and consider Lundgren and his offenses to determine whether the aggravating circumstances of which Lundgren was convicted outweigh the mitigating factors in this case beyond a reasonable doubt.
>
> First, we find that the nature and circumstances of these offenses do not offer the slightest mitigating value.  In contrast, we determine that features of Lundgren's history, character, and background are entitled to some mitigating weight. Lundgren's difficulties in early childhood adversely shaped his personality, and his personality disorder, as attested to by Dr. Schmidtgoessling, adversely affected his ability to cope throughout life.  He has four children and served honorably with the Navy during the Vietnam War.  Additionally,  we accord some mitigating weight to Lundgren's life-long struggles to find meaning and redemption through religion, the Bible, and the Book of Mormon.  Unquestionably, he holds his religious beliefs deeply and strongly, and those beliefs helped shape his life.  Overall, however, we find that the mitigating features of Lundgren's background, history, and character are entitled to only modest weight.
>
> As for the statutory mitigating factors specified in R.C. 2929.04(B), we find that Lundgren's lack of significant criminal convictions must be given some mitigating weight under R.C. 2929.04(B)(5).  However, the other factors listed in R.C. 2929.04(B)(1) through (4), (6), and (7) do not appear to be applicable in this case. None of the victims "induced or facilitated" the offenses and Lundgren did not act under "duress, coercion, or strong provocation."  Also, as Dr. Schmidtgoessling testified, Lundgren's personality disorder does not qualify as a "mental disease or defect." . . . . Finally, Lundgren, who was thirty-eight at the time of the offenses, was the principal offender.  Except for Lundgren's personality disorder and the other matters already considered as to his history, character, and background, no "other factors" appear relevant. Therefore, weighing the aggravating circumstances against the foregoing mitigating factors, we conclude that the aggravating circumstances as to each murder for which Lundgren was convicted outweigh the mitigating factors presented by this case beyond a reasonable doubt.
>
> We also conclude that the death penalty imposed for each aggravated murder is appropriate and proportionate when compared with similar capital cases. This court has upheld the death penalty in cases involving "course of conduct" murders . . . . This court has also upheld the death penalty in cases involving murders occurring during the commission of a kidnapping.

*Id.*

    The state of Ohio argues that this reweighing cured any impermissible weight the jury may have given the prosecutor's impermissible remarks pursuant to the United States Supreme Court's holding in *Clemons v. Mississippi*, 494 U.S. 738 (1990).  The *Clemons* Court held that a state

appellate court can cure a trial court's consideration of unconstitutional aggravating factors by independently "reweighing" aggravating and mitigating factors and reaching a sentence without the consideration of the factors found impermissible at the trial level. *Id.* at 740.

This Court has held that reweighing by the Ohio Supreme Court under Ohio Rev. Code § 2929.05(A) satisfies the requirements of *Clemons* when the court either eliminates impermissible aggravating factors or adds overlooked mitigating factors.[10] *See Baston v. Bagley*, 420 F.3d 632, 638 (6th Cir. 2005). This Court has not addressed a case, however, in which the reweighing is said to cure a trial level violation tending to prejudice the jury's view of the evidence, as opposed to the jury's inclusion of an impermissible factor or failure to consider a relevant mitigating factor. *See id.* We find, however, that the premise of *Clemons* supports application of the *Clemons* doctrine to errors of the sort complained of here. *See Clemons*, 494 U.S. at 750 ("We accordingly see nothing in appellate weighing or reweighing of the aggravating and mitigating circumstances that is at odds with contemporary standards of fairness or that is inherently unreliable and likely to result in arbitrary imposition of the death sentence.")

Here, the Ohio Supreme Court considered the aggravating and mitigating circumstances present in Petitioner's case and independently reweighed such factors: "Therefore, weighing the aggravating circumstances against the foregoing mitigating factors, we conclude that the aggravating circumstances as to each murder for which Lundgren was convicted outweigh the mitigating factors presented by this case beyond a reasonable doubt." *Lundgren*, 653 N.E.2d at 324-25.

The Supreme Court of Ohio's conclusion was not an unreasonable application of federal law. Even were this Court addressing Petitioner's prosecutorial misconduct claim upon direct review under the four-factor test[11] for reversible prosecutorial misconduct in this Circuit, the fourth factor – the total strength of the evidence against the defendant – would counsel strongly against finding even the prosecutor's extended commentary on Petitioner's unsworn statement to constitute flagrant misconduct and therefore reversible error. Having reweighed the aggravating and mitigating factors without the improper inference from Petitioner's refusal to testify under oath, the Ohio Supreme Court found the aggravating factors outweighed the mitigating factors "beyond a reasonable doubt." *Id.* Petitioner does not address the state high court's reweighing of the aggravating and mitigating factors, let alone what effect this reweighing has on this Court's analysis. Given the evidence presented in this case, this Court cannot say that the Supreme Court of Ohio's conclusion is an unreasonable application of federal law.

### 5.        *Summary*

Petitioner alleged eleven instances of prosecutorial misconduct. Petitioner has defaulted nine of these eleven subclaims – (a), (b), (c), (d), (e), (f), (g), (h), and (j) – and has failed to show cause for his default. Of his remaining subclaims (i) and (k), only (i) has any basis in fact. With respect to subclaim (i), the Ohio Supreme Court's determination that the prosecutor's comments on Petitioner's unsworn statement constituted harmless error was not an unreasonable application of

---

[10]The United States Supreme Court has held that its ruling in *Ring v. Arizona*, 536 U.S. 584 (2002), is not retroactive to cases having exhausted direct review. *See Schriro v. Summerlin*, 542 U.S. 348 (2004). Because Petitioner had exhausted direct review in 1995, seven years before *Ring*, this Court need not address whether *Ring* affects the *Clemons* rule.

[11]This Court considers: (1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant. *See Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004).

federal law, in light of the significant evidence going toward both guilt and the weight of aggravating circumstances.

## III.

## CONCLUSION

For the foregoing reasons, we **DENY** the petition for a writ of habeas corpus.

———————————

**DISSENT**

———————————

MERRITT, Circuit Judge, dissenting. Lundgren testified that he killed a family of five cult members as a religious sacrifice. He did so, he said, because he received a command from God that this sacrifice was necessary to prepare for "Zion" and the "Second Coming." I disagree with our Court's decision and reasoning in section II.D.3. above rejecting Lundgren's ineffective assistance of counsel claim based on trial counsel's inexplicable failure to raise the defense of insanity. Other than insanity Lundgren had no defense. In many similar "deific decree" cases in which a "delusional" person like Lundgren professed to be following God's command to kill, defense lawyers have almost uniformly entered an insanity plea – and the jury has accepted the defense in some of the cases. As we shall see, even the prosecutors in the case could not understand why Lundgren's lawyers did not enter such a defense. I will also apply Ohio's definition of insanity in light of a mental illness theory counsel overlooked in bypassing his only available defense. I will then show why, in light of these considerations, the conduct of Lundgren's counsel was manifestly ineffective. The writ of habeas corpus should have issued in this case to require a new trial in which Lundgren would be allowed to present the insanity defense before the jury.

## I. Insanity as a Defense

### A. The Widespread Use of Insanity in Deific Decree Cases

For over two hundred years, trial counsel have presented the insanity defense in "deific decree" cases in many states, including Ohio, and in England. *See State v. Lafferty*, 20 P.3d 342, 363 (Utah 2001) (Mormon fundamentalist, who killed his sister-in-law and her infant child pursuant to God's "removal revelation," presented insanity defense to jury); *People v. Coddington*, 2 P.3d 1081, 1103, 1110-14 (Cal. 2000), *overruled on different grounds by Price v. Superior Court*, 25 P.3d 618, 633 n.13 (Cal. 2001) (defendant presented insanity defense to jury after strangling chaperones of two girls he sexually abused professedly because God commanded the actions); *State v. Blair*, 732 A.2d 448, 449-50 (N.H. 1999) (counsel presented insanity defense to jury in case in which husband bludgeoned his wife and son with a hammer after experiencing a "trance" in which God revealed that he would be cast into the lake of fire if he refused to do so); *People v. Serravo*, 823 P.2d 128, 130 (Colo. 1992) (en banc) (jury found defendant not guilty by reason of insanity for stabbing his wife "in order to sever the marriage bond" in accordance with God's purported instructions); *State v. Ryan*, 444 N.W.2d 610, 632 (Neb. 1989) (cult leader entered plea of not guilty by reason of insanity after following Yahweh's "command" to torture and kill an "unfaithful" cult member); *Laney v. State*, 486 So.2d 1242, 1245-46 (Miss. 1986) (defendant shot police officers because God purportedly commanded the act and presented insanity defense to jury); *State v. Cameron*, 674 P.2d 650, 654 (Wash. 1983) (en banc) (jury question regarding insanity defense existed when defendant implemented God's "command" to stab repeatedly his stepmother to stop the "evil spirit" within her); *State v. Malumphy*, 461 P.2d 677, 678 (Ariz. 1969) (defendant, who shot and killed two co-employees due to his belief that God sanctioned the deeds, presented insanity defense to jury); *State v. Di Paolo*, 168 A.2d 401, 407-08 (N.J. 1961) (defendant repeatedly stabbed ex-girlfriend because God professedly commanded the actions and presented insanity defense to jury); *People v. Schmidt*, 110 N.E. 945, 945 (N.Y. 1915) (defendant, who claimed God commanded him to kill a woman as a sacrifice, presented insanity defense to jury); *State v. Hudson*, No. 01C01-9508-CC-00270, 1999 WL 77844, at **1, 8 (Tenn. Crim. App. Feb. 19, 1999) (appellate court remanded for entry of a judgment of not guilty by reason of insanity in case in which defendant shot her one-month-old nephew, believing that God had instructed her to kill "the son of Satan"); *State v. McDaniel*, No. 18805, 1998 WL 887184, at **2-3 (Ohio Ct. App. Dec. 16, 1998) (defendant, after experiencing religious delusion that God commanded him to kill his wife with a baseball bat, presented insanity

defense to jury); *Ivery v. State*, 686 So.2d 495, 499-503 (Ala. Crim. App. 1996) (defendant, who claimed to be the "ninja of God" and to have followed God's command "to kill people at will and to take their money as the spoils of victory," presented insanity defense to jury); *People v. Wilhoite*, 592 N.E.2d 48, 55-58 (Ill. App. Ct. 1991) (court found defendant not guilty by reason of insanity after she followed God's "command" to shove her nine-year-old daughter out of apartment window to pass "a test to see if the defendant could get into heaven" prior to the imminent end of the world); *Perkey v. Cardwell*, 369 F. Supp. 770, 770-74 (S.D. Ohio 1973), *aff'd*, 492 F.2d 1244 (6th Cir. 1974) (defendant claimed he was carrying out God's orders by shooting victim and entered plea of not guilty by reason of insanity); *United States v. Guiteau*, 10 F. 161, 186 (D.D.C. 1882) (defendant alleged he was following God's command to kill the president and presented insanity defense to jury); Elizabeth Mehren, *Fellow Inmate Guilty of Murdering Ex-Priest*, Los Angeles Times, Jan. 26, 2006, at A15 (Massachusetts inmate, who claimed God commanded him to kill defrocked priest, presented insanity defense to jury); *Mom Who Killed Kids with Rocks Committed to Mental Hospital*, Chi. Trib., Apr. 7, 2004, at 8 (Texas jury found mother innocent by reason of insanity after she stoned two of her young sons to death with heavy rocks professedly in accordance with God's instructions); Richard Moran, *The Origin of Insanity as a Special Verdict: The Trial for Treason of James Hadfield (1800)*, 19 Law & Soc'y Rev. 487, 508 (1985) (jury acquitted defendant who pled insanity defense following attempted shooting of the king of England purportedly at God's direction); *cf. State v. Wilson*, 700 A.2d 633, 641 (Conn. 1997) ("An individual laboring under a delusion that causes him to believe in the divine approbation of his conduct is an individual who, in all practicality, is unlikely to be able fully to appreciate the wrongfulness of that conduct.").[1]

In fact, the insanity defense was even raised in the trial of one of Lundgren's cult followers, *see State v. Luff*, 621 N.E.2d 493, 498 (Ohio Ct. App. 1993), but, to the puzzlement of the prosecutors, was not presented in Lundgren's own case:

> None of the cult defendants had as yet pled [not guilty by reason of insanity], even though the acts in question were so illogical, and some of the other conduct of the group members was so bizarre that the prosecutors had wondered why at least one of them had not entered such a plea.

Cynthia Stalter Sassé & Peggy Murphy Widder, *The Kirtland Massacre* 273 (1991) (full-length book co-written by one of Lundgren's prosecutors).

### B. The Origins of the Insanity Defense in Deific Decree Cases

As early as 1800, the defense of not guilty by reason of insanity was successful in a deific decree case in England. *See generally Hadfield's Case*, 27 How. St. Tr. 1281 (K.B. 1800). James Hadfield, a former British soldier, fired a horse pistol at King George III in Drury Lane Theatre but missed the King's head by less than a foot-and-a-half. Richard Moran, *The Origin of Insanity as a Special Verdict: The Trial for Treason of James Hadfield (1800)*, 19 Law & Soc'y Rev. 487, 487 (1985). Hadfield believed that God had told him to sacrifice himself to save the world and chose assassinating the King as the surest way of assuring his own death. *Id.* at 504-06. Renowned

---

[1] I am aware of only a few deific decree cases in which the insanity defense was not presented. In one of them, the failure to do so was held to constitute ineffective assistance of counsel. *Galloway v. State*, 698 P.2d 940, 942 (Okla. Crim. App. 1985) (defendant, at the professed direction of God, "drove demons out" of his neighbor by killing him). In another, the defendant represented himself. Jon Krakauer, *Under the Banner of Heaven* xxii-xxiii (large print ed. 2003) (Mormon fundamentalist killed his sister-in-law and her infant child pursuant to God's "removal revelation"). The brother of the aforementioned defendant declined to raise the insanity defense in his first trial because he believed the jury would interpret that defense as an admission of guilt, but, in his retrial, allowed counsel to present the insanity defense. *State v. Lafferty*, 20 P.3d 342, 363 (Utah 2001); *State v. Lafferty*, 749 P.2d 1239, 1250 (Utah 1988). In addition, prosecutors wondered why some of Lundgren's followers did not raise the insanity defense. *See* Cynthia Stalter Sassé & Peggy Murphy Widder, *The Kirtland Massacre* 273 (1991).

barrister Thomas Erskine defended Hadfield and entered an insanity plea, and the jury returned a verdict of not guilty by reason of insanity. *Id.* at 408, 508.

Forty-three years later, the House of Lords promulgated the M'Naghten rule, which provides the defense of insanity if, "at the time of the committing the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, [he] did not know he was doing what was wrong." *M'Naghten's Case*, 8 Eng. Rep. 718, 722 (1843). Use of the insanity defense in deific decree cases has been especially widespread in jurisdictions like Ohio following some form of the M'Naghten rule. *See State v. Staten*, 247 N.E.2d 293, 295 (Ohio 1969) (The Ohio Supreme Court "has always stated the substance of [the M'Naghten] rule as a part of its own test for determining whether an accused should be relieved of criminal responsibility for an act."); Margaret E. Clark, Comment, *The Immutable Command Meets the Unknowable Mind: Deific Decree Claims and the Insanity Defense after* People v. Serravo, 70 Denv. U. L. Rev. 161, 169 (1992) ("The major cases dealing with the deific decree come from M'Naghten jurisdictions.").

The classic example of insanity under the M'Naghten rule was the deific decree to kill. In 1844, one year after *M'Naghten's Case* was decided, the Supreme Judicial Court of Massachusetts provided this illustration of insanity in a murder trial credited as the first American case to cite the M'Naghten test, Grant H. Morris & Ansar Haroun, *"God Told Me To Kill": Religion or Delusion?*, 38 San Diego L. Rev. 973, 1004 (2001):

> A common instance is where he fully believes that the act he is doing is done by the immediate command of God, and he acts under the delusive but sincere belief that what he is doing is by the command of a superior power, which supersedes all human laws, and the laws of nature.

*Commonwealth v. Rogers*, 48 Mass. (7 Met.) 500, 503 (1844).

In 1882, Charles Guiteau was tried for assassinating President James Garfield and relied upon the insanity defense, claiming that God told him to kill the President. The judge instructed the jury with citation to the above example of insanity and with his own illustration:

> Another man, whom you know to be an affectionate father, insists that the Almighty has appeared to him and commanded him to sacrifice his child. No reasoning has convinced him of his duty to do it, but the command is as real to him as my voice is now to you. No reasoning or remonstrance can shake his conviction or deter him from his purpose. This is an insane delusion, the coinage of a diseased brain, as seems to be generally supposed, which defies reason and ridicule, which palsies the reason, blindfolds the conscience, and throws into disorder all the springs of human action.

*United States v. Guiteau*, 10 F. 161, 172 (D.D.C. 1882). In applying the M'Naghten rule, the judge specifically informed the jury that "if [Guiteau ] was under an insane delusion that the Almighty had commanded him to do the act, and in consequence of that he was incapable of seeing that it was a wrong thing to do, -- then he was not in a responsible condition of mind, and was an object of compassion, and not of justice, and ought to be now acquitted." *Id.* at 186.

Thirty years later, Justice Benjamin Cardozo, then writing for the New York Court of Appeals, concluded that, in the words of two commentators, the deific decree to kill presented "the strongest case for finding the defendant insane" under the M'Naghten rule. Morris & Haroun, *supra*, at 1007. Justice Cardozo recounted the previous two examples of insanity and provided another:

A mother kills her infant child to whom she has been devotedly attached. She knows the nature and quality of the act; she knows that the law condemns it; but she is inspired by an insane delusion that God has appeared to her and ordained the sacrifice. It seems a mockery to say that, within the meaning of the statute, she knows that the act is wrong.

*People v. Schmidt*, 110 N.E. 945, 949 (N.Y. 1915). According to Justice Cardozo, holding such a defendant criminally responsible would be "abhorrent," and a jury would likely disregard a jury instruction directing otherwise. *Id.*

In more modern times, both before and after Lundgren's trial, numerous courts, including at least two in Ohio, have recognized, either explicitly or implicitly, the deific decree doctrine as an appropriate basis for the insanity defense, especially in M'Naghten jurisdictions. *See* cases cited *supra* in section I.A.

### C. Ohio's Insanity Defense

Ohio's definition of insanity applicable to Lundgren's trial was, according to the state's Supreme Court, "more liberal to those accused of crime" than the traditional M'Naghten rule, *State v. Staten*, 247 N.E.2d 293, 295 (Ohio 1969), and was defined as follows:[2]

1. One accused of criminal conduct is not responsible for such criminal conduct if, at the time of such conduct, as a result of mental disease or defect, he does not have the capacity either to know the wrongfulness of his conduct or to conform his conduct to the requirements of law . . . .

2. In order to establish the defense of insanity where raised by plea in a criminal proceeding, the accused must establish by a preponderance of the evidence that disease or other defect of his mind had so impaired his reason that, at the time of the criminal act with which he is charged, either he did not know that such act was wrong or he did not have the ability to refrain from doing that act.

*State v. Luff*, 621 N.E.2d 493, 498 (Ohio Ct. App. 1993) (quoting *Staten*, 247 N.E.2d at 294 (syllabus by the court)). Thus, Ohio law's definition of insanity had two elements: (1) mental disease or defect, and (2) a corresponding incapacity "either to know the wrongfulness of his conduct or to conform his conduct to the requirements of law." *Id.* The Supreme Court of Ohio has emphasized that "insanity is an issue for the jury to decide" and that "[t]he weight to be given the evidence and the credibility of the witnesses concerning the establishment of the defense of insanity in a criminal proceeding are primarily for the trier of the facts." *State v. Thomas*, 434 N.E.2d 1356, 1357-58 (Ohio 1982); *see also Ake v. Oklahoma*, 470 U.S. 68, 81 (1985) ("Perhaps because there often is no single, accurate psychiatric conclusion on legal insanity in a given case, juries remain the primary factfinders on this issue . . . ."); Paul H. Robinson, *Criminal Law* § 9.3 (1997) ("What constitutes a mental disease or defect is a question for the jury."); *State v. McDaniel*, No. 18805, 1998 WL 887184, at *3 (Ohio Ct. App. Dec. 16, 1998) (insanity plea in deific decree case presented to jury); *Perkey v. Cardwell*, 369 F. Supp. 770, 771 (S.D. Ohio 1973), *aff'd*, 492 F.2d 1244 (6th Cir. 1974) (insanity plea in deific decree case presented to trier of fact).

The following two sections apply both elements of Ohio's definition of insanity to the Lundgren case and conclude that a jury could have justifiably considered Lundgren legally insane.

---

[2]Ohio has since changed its definition of insanity. *See State v. Luff*, 621 N.E.2d 493, 498 (Ohio Ct. App. 1993).

## II. Mental Disease or Defect

A mental health theory upon which insanity could have been based was readily available at the time of Lundgren's trial. Based on the diagnosis of Dr. Jeffrey L. Smalldon attached to Lundgren's habeas petition, the psychiatric literature, and treatment of similar deific decree killings in the case law, there was at least a jury question as to whether Lundgren, a cult leader whose extreme and deranged religious views prompted his belief that God commanded him to kill a family of five, suffered from the mental condition known as delusional disorder with grandiose themes.

### A. Overview of Delusional Disorder with Grandiose Themes

Although the definition of "delusion" and the propriety of encompassing religious beliefs within that definition are both somewhat unsettled, there is ample support in the psychiatric literature for the notion that some extreme beliefs like the deific decree to kill are delusional and grandiose. At the time of Lundgren's trial, the term "delusion" was defined in the *Diagnostic and Statistical Manual of Mental Disorders* (rev. 3d ed. 1987) ("DSM-III-R"), the "psychiatric profession's diagnostic Bible," Morris & Haroun, *supra*, at 1023 (quoting various sources), as:

> A false personal belief based on incorrect inference about external reality and firmly sustained in spite of what almost everyone else believes and in spite of what constitutes incontrovertible and obvious proof or evidence to the contrary. The belief is not one ordinarily accepted by other members of the person's culture or subculture (i.e., it is not an article of religious faith).

DSM-III-R at 395.[3] The DSM sets out various subtypes of delusional disorder. One such subtype is "grandiose delusion," defined as "[a] delusion whose content involves an exaggerated sense of one's importance, power, knowledge, or identity. It may have a religious, somatic, or other theme." *Id.* at 396. The psychiatrist's "Bible" further notes that people with grandiose delusions "can become leaders of religious cults." *Id.* at 200. These definitions, both published by the American Psychiatric Association ("APA"), explicitly, though inartfully, embrace the notion that some religious beliefs are delusional. As two recent commentators have noted, "the DSM distinguishes between 'authentic' religious beliefs that are characterized as normal and 'nonauthentic' religious beliefs that may be characterized as abnormal, that is, psychopathological." Morris & Haroun, *supra*, at 1037.

A chief criticism leveled at the DSM's definition of delusion is its usage of the phrase "false belief," which generates the obvious problem scientifically and legally of divining true from false religious beliefs. *See* Manfried Spitzer, *On Defining Delusions*, 31 Comprehensive Psychiatry 377, 378 (1990) (stating that the question of truth or falsity is inapplicable to religious beliefs). Responding to this dilemma, some scholars have proposed excluding all religious beliefs from constituting delusions, while others like Freud have characterized all religious belief as delusional. *Id.* at 379. In an article published the year of Lundgren's trial, Dr. Manfried Spitzer dismissed both of these views as " 'quick and cheap' solutions" and clinically unjustified, opting instead for the APA's general view that some, not all, religious beliefs are delusional. *Id.* Dr. Spitzer differed with the APA's DSM in defining delusion so as to accommodate more clearly the problem of religious delusions as "statements about external reality which are uttered like statements about a mental state, i.e., with subjective certainty and incorrigible by others." *Id.* at 391.

---

[3]The current version of the DSM, *Diagnostic and Statistical Manual of Mental Disorders* (rev. 4th ed. 2000) ("DSM-IV-TR"), provides quite similar definitions of "delusion" and of "grandiose delusion" to those found in DSM-III-R. *See* Morris & Haroun, *supra*, at 1025.

Regardless of the definition of delusion, many, if not the vast majority of, mental health professionals agree with the APA and Dr. Spitzer that some purportedly religious beliefs and experiences should be considered delusional. *The New Harvard Guide to Psychiatry*, published over two years before Lundgren's trial, describes both grandiose and religious delusions under the general heading "Schizophrenic Disorders." Ming T. Tsuang, Stephen V. Faraone & Max Day, *Schizophrenic Disorders*, *in The New Harvard Guide to Psychiatry* 267-68 (Armand M. Nicholi, Jr., ed., 1988). According to the text, a patient claiming to be "king of the universe" because of his special relationship with God suffers from a grandiose delusion. *Id.* at 267. The text describes religious delusions in even greater depth:

> *Religious delusions* are false beliefs that involve religious or spiritual themes. The delusional status of a religious belief may be obvious, as in the case of a patient who collected a roomful of grapefruits because she believed they contained the essence of God. More than with other delusions, however, the delusional status of religious beliefs may be difficult to establish. A religious belief is not delusional if consistent with the patient's cultural context. For example, many Jehovah's Witnesses believe in the imminent end of the world. Such a belief would not be delusional if expressed by a member of that sect, but it might be delusional if expressed by a nonreligious person . . . A delusional religious belief is likely to lead to functional impairment.

*Id.* at 267-68 (emphasis in original).

Following the DSM's lead, a recent psychiatry textbook illustrates a grandiose type delusional disorder with a religious example:

> A 51-year-old man was arrested for disturbing the peace. Police had been called to a local park to stop him from carving his initials and those of a recently formed religious cult into various trees surrounding a pond in the park. When confronted, he had scornfully argued that having been chosen to begin a new townwide religious revival, it was necessary for him to publicize his intent in a permanent fashion. The police were unsuccessful in preventing the man from cutting another tree and arrested him. Psychiatric examination was ordered at the state hospital, and the patient was observed there for several weeks. He denied any emotional difficulty and had never received psychiatric treatment. There was no history of euphoria or mood swings. The patient was angry about being hospitalized and only gradually permitted the doctor to interview him. In a few days, however, he was busy preaching to his fellow patients and letting them know that he had been given a special mandate from God to bring in new converts through his ability to heal. Eventually, his preoccupation with special powers diminished, and no other evidence of psychopathology was observed. The patient was discharged, having received no medication at all. Two months later he was arrested at a local theater, this time for disrupting the showing of a film that depicted subjects he believed to be satanic.

Benjamin James Sadock & Virginia Alcott Sadock, *Kaplan & Sadock's Synopsis of Psychiatry* 517 (9th ed. 2003).

Other sources similarly posit the existence of religious delusions. *See* Joseph Westermeyer, *Some Cross-Cultural Aspects of Delusions*, *in Delusional Beliefs* 216-17 (Thomas F. Oltmanns et al. eds., 1988) (describing study of patients with religious delusions); Robert L. Spitzer, Michael B. First, Kenneth S. Kendler & Dan J. Stein, *The Reliability of Three Definitions of Bizarre Delusions*, 150 Am. J. Psychiatry 880, 881 (1993) (discussing delusions with religious themes).

Perhaps the most clinically effective method for distinguishing authentic religious experience from insanity was uncovered in a study of how mental health professionals make such diagnoses. *See* Susan Sanderson, Brian Vandenberg & Paul Paese, *Authentic Religious Experience or Insanity?*, 55 J. Clinical Psychol. 607 (1999) (hereinafter "Sanderson Study"). The Sanderson Study asked sixty-seven mental health professionals to rate eighteen different religious beliefs as authentic religious experiences or as delusions with religious content. *Id.* at 609-10. The studied religious beliefs ranged from following a biblical passage to "cut off the hand that has sinned" by cutting out the habit of shopping to hearing the voice of God telling a person to sacrifice his child. *Id.* Of the eighteen scenarios, the mental professionals considered the deific decree to sacrifice a child to be the least religiously authentic and the most delusional. *Id.* at 611. The authors offered this summary of their conclusions:

> The essential determining factor in the ratings was . . . the degree to which religious experience deviated from conventional religious beliefs and practices. The more unconventional the experience, the less religiously authentic and less mentally healthy it was deemed to be.

> The importance of deviation from cultural convention is underscored by the fact that the two experiences rated least authentic and mentally healthy were also the two that involved the most severe physical consequences: complying with a request from God to sacrifice one's child, and following a literal interpretation of the biblical scripture to cut off one's hand . . . These results suggest that participants were doing something similar to what DSM-IV prescribes, using (implicit) cultural norms as the basis for evaluating religious experience and mental health."

*Id.* at 614.[4]

## B. Lundgren's Mental Condition

### 1. The Diagnoses of Dr. Smalldon and Dr. Schmidtgoessling

In his affidavit attached to Lundgren's habeas petition, Dr. Jeffrey L. Smalldon, a psychologist licensed in Ohio, diagnosed Lundgren's mental condition as follows:

> [I]t is my opinion, within reasonable psychological certainty, that Mr. Lundgren suffers from both a severe character disorder and a psychotic disorder. Although I am unable to conclusively rule out the possibility of Paranoid Schizophrenia, in my opinion his psychotic condition is best described as either Delusional Disorder, Mixed Type (with grandiose and persecutory themes) or Psychotic Disorder Not Otherwise Specified.

(J.A. at 0118.) The specification "Mixed Type" "applies when no one delusional theme predominates." DSM-IV-TR at 325. Accordingly, Dr. Smalldon's characterization of Lundgren's delusional disorder as "Mixed Type" presumably resulted from his identification both of grandiose themes, discussed above, and persecutory themes. DSM-IV-TR sets forth the following definition of "Persecutory Type" delusional disorder:

---

[4] Two commentators disagreed with the Sanderson Study's conclusion that the participants were essentially following the DSM's prescriptions, arguing instead that the "DSM-IV's discussion of ethnic and cultural considerations was clearly intended to expand the scope of 'normal' thought beyond the ideas of the dominant culture, not to contract it to conforming views of the orthodox." Morris & Haroun, *supra*, at 1040.

> This subtype applies when the central theme of the delusion involves the person's belief that he or she is being conspired against, cheated, spied on, followed, poisoned or drugged, maliciously maligned, harassed, or obstructed in the pursuit of long-term goals. Small slights my be exaggerated and become the focus of a delusional system . . . Individuals with persecutory delusions are often resentful and angry and may resort to violence against those they believe are hurting them.

*Id.*

At the time of Lundgren's trial, DSM-III-R established five diagnostic criteria for delusional disorder.[5] The first and "essential" feature of delusional disorder is "the presence of a persistent, nonbizzare delusion" of at least one month's duration that is not the product of another mental disorder. DSM-III-R at 199, 202. Distinguishing "bizarre" from "nonbizarre" delusions is not an exact science, especially in the context of religious delusions. *See generally* Robert L. Spitzer et al., *supra* (discussing three definitions of bizarre delusions). DSM-III-R, nonetheless, defines a "bizarre delusion" as "[a] false belief that involves a phenomenon that the person's culture would regard as totally implausible." DSM-III-R at 395. Examples of bizarre religious delusions include "the belief that, when swallowing, a person ingests parts of the Devil" and the delusion "of an elderly widow who believes that her body has been invaded by parasites; by traveling up and down her spinal column, they have created a magnetic current that causes rosary beads near her to rotate in a clockwise direction." Robert L. Spitzer et al., *supra*, at 881. On the other hand, nonbizarre delusions generally involve situations that occur in real life, "such as being followed, poisoned, infected, loved at a distance, having a disease, [or] being deceived by one's spouse or lover." DSM-III-R at 202. A person incorrectly believing that he has a special message from a deity is an example of a nonbizarre religious delusion. *See* DSM-IV-TR at 325.

Lundgren's belief that God commanded him to kill the Avery family to "purify" the cult so that the members could see God is most likely a "nonbizarre delusion" and is dissimilar to the "totally implausible" beliefs characterizing "bizarre" religious delusions. "I am a prophet of God," Lundgren claimed in his unsworn statement at the sentencing phase, "I am even more than a prophet." (J.A. at 10894.) Dr. Smalldon summarized some of Lundgren's beliefs that could be considered grandiose delusions:

> He has claimed to possess special powers, among them the ability to predict future events; the ability to "sense" the presence of people and events which are at a geographical remove from where he is; and the ability to trigger "natural" events such as earth tremors. He reportedly told his followers that he was present at Golgotha when Jesus Christ was crucified, and that in other ways as well he was able to transcend the restrictions of time. He claims to have experienced multiple "visions" where he has had illuminated for him certain aspects of his special mission on earth.

(J.A. at 0108.) Lundgren reportedly announced that, because of his faithfulness in killing the Averys, Jesus Christ gave Lundgren the title "God of the whole Earth," made him divine and immortal so that he could not be "pierced" by bullets, knives, or any other objects, and made him "the law." Pete Earley, *Prophet of Death: The Mormon Blood-Atonement Killings* 309 (1991); (*see also* J.A. at 0105.). Moreover, Lundgren's belief that God instructed him to kill the Avery family was "persistent" in that it lasted more than one month. He received the "revelation" roughly six months before the murder, *see* Earley, *supra*, at 267, and apparently maintains to this day that God commanded the killings.

---

[5]DSM-IV-TR at 329 provides essentially the same five criteria.

The second diagnostic criterion is that "[a]uditory or visual hallucinations, if present, are not prominent [as defined in Schizophrenia, A(1)(*b*)]." DSM-III-R at 202. A "hallucination" is "[a] sensory perception without external stimulation of the relevant sensory organ." *Id.* at 398. Religious delusions are less common in Schizophrenia than various other types of delusions, *id.* at 188, and "[h]allucinations occurring in the course of an intensely shared religious experience generally have no pathological significance," *id.* at 398. A "prominent hallucination" occurs "throughout the day for several days or several times a week for several weeks, each hallucinatory experience not being limited to a few brief moments." *Id.* at 194. The mental health experts assessing Lundgren did not indicate that he experienced hallucinations, and, in any event, any hallucinations in fact occurring were apparently too brief to be considered "prominent."

Third, the individual's behavior is not "obviously odd or bizarre" apart from the delusions and their ramifications. *Id.* at 202. Accordingly, "[i]mpairment in daily functioning is rare." *Id.* at 200. Lundgren's behavior did not appear to be "obviously odd or bizarre" apart from his religious beliefs and their ramifications. For example, he enjoyed watching movies and lifting weights. *See* (J.A. at 10970.); Cynthia Stalter Sassé & Peggy Murphy Widder, *The Kirtland Massacre* 45-46, 63-64 (1991).

Fourth, "[i]f a Major Depressive or Manic Syndrome has been present during the delusional disturbance, the total duration of all episodes of the mood syndrome has been brief relative to the total duration of the delusional disturbance." DSM-III-R at 202. Both Major Depressive and Manic Syndrome are defined terms, neither of which appear to describe Lundgren. *See id.* at 217, 222; (*cf.* J.A. at 0093 ("He struck me [Dr. Smalldon] as neither depressed nor unusually anxious . . . .").).

Fifth, the individual "[h]as never met criterion A for Schizophrenia, and it cannot be established that an organic factor initiated and maintained the disturbance." DSM-III-R at 202. Lundgren does not appear to meet criterion A for Schizophrenia, and has not been diagnosed as schizophrenic.[6] *See id.* at 194-95. The term "organic factor" refers to a substance (e.g., cocaine) or a general medical condition (e.g., Alzheimer's disease). *See id.* at 119, 201; DSM-IV-TR at 324. The record does not show that Lundgren took drugs or had any such medical condition constituting an organic factor. (*See* J.A. at 0111.)

As Dr. Smalldon indicated, Lundgren appears to satisfy all five criteria for delusional disorder.

Dr. Nancy Schmidtgoessling, also a licensed psychologist, similarly testified during the penalty phase that, through his odd religious views, Lundgren became "more out of touch with reality," "more caught up in revelations and his visions," and "more grandiose." (J.A. at 10829.) She noted Lundgren's belief that he had "special powers" and could interpret "biblical things in a way no one else could" and that he "really believed . . . that it was right to kill these folks because he believed that God commanded him to do so." (J.A. at 10830, 10836.) She concluded that Lundgren suffered from a mixed personality disorder with the predominate features being narcissism, paranoia, and anti-social traits. (J.A. at 10834.) Although she did not believe that Lundgren was insane or had a mental disease or defect (J.A. at 10860.), insanity is ultimately a question for the jury, not expert witnesses, to decide. *See State v. Thomas*, 434 N.E.2d 1356, 1357 (Ohio 1982).

---

[6]Dr. Smalldon asserted that "I am unable to conclusively rule out the possibility of Paranoid Schizophrenia" in paragraph 65 of his affidavit. (J.A. at 0118.)

## 2. Similar Cases Addressing Delusional Disorder

Trial counsel in two situations with striking similarity to the instant case presented an insanity defense to the jury, as least in part, on the basis of the defendant's delusional disorder. In a rural Nebraska setting in the early 1980s, Michael Ryan formed and led a religious cult developed out of the teachings of a group called the "Posse Comitatus." *State v. Ryan*, 444 N.W.2d 610, 617 (Neb. 1989). Like Lundgren, Ryan stockpiled weapons in apocalyptic anticipation, practiced polygamy, and frequently "talked to Yahweh." *Id.* at 618-19. In 1985, Ryan claimed that Yahweh ordered the appalling torture and death of one cult member who was "lacking in faith" so as to purify the farm before the immaculate birth of one of the cult member's children. *Id.* at 620-22; *Ryan v. Clarke*, 281 F. Supp. 2d 1008, 1058 (D. Neb. 2003), *aff'd*, 387 F.3d 785 (8th Cir. 2004), *cert. denied*, 125 S. Ct. 2526 (2005).

At his trial in 1986, Ryan plead not guilty by reason of insanity. *Ryan*, 444 N.W.2d at 632. To bolster this defense, Ryan presented the testimony of a psychiatrist and a psychologist. The psychiatrist diagnosed Ryan as suffering from paranoid schizophrenia with "auditory hallucinations, delusions, and psychosis." *Ryan*, 281 F. Supp. 2d at 1059. At the penalty phase, the same psychiatrist further testified that Ryan was "actively psychotic" and "clearly delusional." *Ryan*, 444 N.W.2d at 644. The defense's psychologist did not diagnose paranoid schizophrenia but instead concluded that Ryan suffered from a delusional disorder. *Ryan*, 281 F. Supp. 2d at 1061 n.10. The psychologist further stated that "Ryan had a paranoid personality disorder and a paranoid disorder characterized by active delusional thinking." *Id.* at 1059. The state's psychiatrist disagreed with both of the defense's experts, concluding that Ryan was not mentally ill and exhibited no evidence of psychosis. *Id.* at 1060-61. Although the jury ultimately rejected the insanity defense, Ryan's counsel did present the issue to the jury. *Ryan*, 444 N.W.2d at 617.

Another strikingly similar situation arose out of two murders in Utah on July 24, 1984. Ron and Dan Lafferty, two Mormon fundamentalist brothers, joined a "School of the Prophets" where they received "revelations" from God and embraced the doctrine of "plural marriage." *State v. Lafferty*, 20 P.3d 342, 351 (Utah 2001); Jon Krakauer, *Under the Banner of Heaven* 247, 260 (large print ed. 2003). In the spring of 1984, Ron received a "removal revelation" ordering the deaths of his sister-in-law and her infant daughter, who, according to the "revelation," had become "obstacles" in God's path. *Lafferty*, 20 P.3d at 352. Two years later, the Lafferty brothers fulfilled the "revelation" with murders so horrific they inspired Jon Krakauer's full-length book *Under the Banner of Heaven*. That same day, the brothers abandoned a plan to murder the local Mormon leader who had previously excommunicated Ron from the Mormon church. *State v. Lafferty*, 749 P.2d 1239, 1241 (Utah 1988).

At his first trial in 1985, Ron refused to present the insanity defense because he believed the jury would interpret that defense as an admission of guilt.[7] *Id.* at 1250. He appealed the conviction and sentence in part on the ground that he was not competent to stand trial. *Id.* at 1242. While in prison awaiting his 1985 trial, Ron attempted to hang himself, apparently resulting in some organic brain damage due to oxygen deprivation. *Lafferty v. Cook*, 949 F.2d 1546, 1552 (10th Cir. 1991). At a competency hearing prior to his 1985 trial, medical examiners diagnosed him with two mental disorders: (1) an amnestic syndrome resulting from his suicide attempt, and (2) delusional disorder, also called a "paranoid delusional system." *Lafferty*, 749 P.2d at 1242-43; *see also* DSM-III-R at 199 (referring to delusional disorder as "Delusional (Paranoid) Disorder" and noting that this category was called "Paranoid Disorder" in DSM-III). Over two years before Lundgren's trial, the Utah Supreme Court summarized the examiners' findings of Ron's mental condition:

---

[7]Dan Lafferty defended himself, was sentenced to life in prison, and apparently has not appealed the verdict or sentence. *See* Krakauer, *supra*, at xxii-xxiii.

In describing the symptoms of the paranoid disorder, the examiners stated that Lafferty's pervasive religiosity, which had been noted during the November, 1984 evaluation, had since developed into a "religious delusional system," that Lafferty was unable to determine the boundaries between himself and spiritual beings, that he was experiencing "blurred ego boundaries," that he was suffering from a "religious martyr complex," that his mind had created a "paranoid pseudo-community involving the legal and social systems," that one of Lafferty's revelations was "reflective of Messianic grandiosity," that Lafferty felt the hospital and the judicial system were agents of corrupt man-made law and were on trial before God, and that it was "impossible for him to [understand] the inconsistency of his objecting to others infringing on his liberty [while he claimed] an entitlement from God to infringe on the liberty of others."

*Lafferty*, 749 P.2d at 1242-43. In 1991, the Tenth Circuit granted Ron's habeas petition on the ground that the Utah court misapplied the competency standard in light of Ron's "paranoid delusional system." *Lafferty*, 949 F.2d at 1556.

Ron was retried in 1996 and, after spending over a decade in prison, allowed his counsel to pursue the insanity defense. *Lafferty*, 20 P.3d at 363. The defense called a psychiatrist and a clinical and forensic psychologist who both testified that Ron suffered from a delusional disorder. Krakauer, *supra*, at 493-94. The state's experts offered a different analysis, concluding that Ron's extreme beliefs were not psychotic and, if anything, exhibited the symptoms of narcissistic personality disorder. *Id.* at 495-511. The jury again rejected the insanity defense, but, unlike Lundgren's case, the jury, not counsel, decided the issue of sanity. *Lafferty*, 20 P.3d at 355.

Counsel in other deific decree cases have also presented the insanity defense at least partly on the basis of the defendant's delusional disorder. *See, e.g., People v. Coddington*, 2 P.3d 1081, 1103, 1110-14 (Cal. 2000), *overruled on different grounds by Price v. Superior Court*, 25 P.3d 618, 633 n.13 (Cal. 2001); *State v. Hudson*, No. 01C01-9508-CC-00270, 1999 WL 77844, at **3-4 (Tenn. Crim. App. Feb. 19, 1999).

Therefore, in light of Dr. Smalldon's diagnosis, the psychiatric literature, and similar cases, the issues of whether Lundgren suffered from delusional disorder with grandiose themes and whether that condition constitutes a mental disease or defect should have been presented to the jury.

### III. Knowledge of Wrongfulness or Incapacity to Conform Conduct to the Law

Lundgren also raises at least a jury question as to whether he could have met the second element of Ohio's insanity defense – that he had an incapacity "either to know the wrongfulness of his conduct or to conform his conduct to the requirements of law." *State v. Luff*, 621 N.E.2d 493, 498 (Ohio Ct. App. 1993) (quoting *State v. Staten*, 247 N.E.2d 293, 294 (Ohio 1969) (syllabus by the court)).

Determining whether Lundgren knew the wrongfulness of his conduct hinges on whether the term "wrong" refers to moral or legal wrong. Courts have disagreed on this issue. In his majority opinion in *People v. Schmidt*, 110 N.E. 945, 949 (N.Y. 1915), Justice Cardozo strenuously advocated the "morally wrong" interpretation, deriding the alternative as leading to "abhorrent" results:

We hold, therefore, that there are times and circumstances in which the word 'wrong' as used in the statutory test of responsibility ought not to be limited to legal wrong . . . Obedience to the law is itself a moral duty. If, however, there is an insane delusion that God has appeared to the defendant and ordained the commission of a crime, we think it cannot be said of the offender that he knows the act to be wrong.

Various courts have followed this view.  *E.g.*, *State v. Wilson*, 700 A.2d 633, 641 (Conn. 1997); *People v. Serravo*, 823 P.2d 128, 137 (Colo. 1992) (en banc); *State v. Worlock*, 569 A.2d 1314, 1322 (N.J. 1990); *State v. Crenshaw*, 659 P.2d 488, 494 (Wash. 1983) (en banc).

At the time of Lundgren's trial in 1990, Ohio law was somewhat unsettled on this question, and the seminal insanity case from the Ohio Supreme Court left this question unaddressed.  *See generally Staten*, 247 N.E.2d 293.  Two unreported *per curiam* decisions from the Ohio Court of Appeals suggested that the term "wrong" refers to only legal wrong.  *State v. Huntley*, No. C-800780, 1981 WL 9989, at *2 (Ohio Ct. App. Sept. 2, 1981) (per curiam); *State v. Graves*, No. C-790605, 1980 WL 353046, at *3 (Ohio Ct. App. July 16, 1980) (per curiam).  In a case postdating Lundgren's trial, the Ohio Court of Appeals agreed with the "legally wrong" view.  *Luff*, 621 N.E.2d at 499.  There is little question that Lundgren knew that it was against the law for him to kill the Avery family.  There is also little question that Lundgren could not have known it to be morally wrong to do so if he believed God commanded the act.  In light of the unsettled status of Ohio's insanity law in 1990, Lundgren's counsel should have put this question to the jury.

Regardless of Ohio's definition of "wrong," Lundgren appears to satisfy easily the alternative basis for establishing the second element of the insanity defense – that he had an incapacity "to conform his conduct to the requirements of law." *Staten*, 247 N.E.2d at 294 (syllabus by the court). This alternative basis is perhaps the prime example of Ohio's then "more liberal" approach to the insanity defense than the M'Naghten rule.  *See id.* at 295.  Punishing an individual without the capacity to avoid wrongful actions "would be like inflicting punishment upon an inanimate object, such as a machine, because it had, without any intelligent human intervention, caused some damage." *Id.* at 298.  As Dr. Smalldon indicated, a person like Lundgren truly believing that God commanded him to kill probably does not have the capacity to conform his conduct to the law's requirements.  (J.A. at 0114.)

After applying both elements of Ohio's definition of insanity to Lundgren's mental condition, Dr. Smalldon concluded that "within reasonable psychological certain[t]y . . . Mr. Lundgren's clinical condition was such that he should have been seen as eligible at the time of his 1990 trial for a defense of not guilty by reason of insanity." (J.A. at 0121.)  I agree.  A jury could have justifiably considered Lundgren legally insane.

### IV. Ineffective Assistance of Counsel

I now turn to whether the failure to present the insanity defense constituted ineffective assistance of counsel.  The Sixth Amendment, as incorporated through the Due Process Clause of the Fourteenth Amendment, guarantees a criminal defendant in state court proceedings the right "to have the Assistance of Counsel for his defence." *Strickland v. Washington*, 466 U.S. 668, 684-85 (1984).  A violation of this right has two elements: a petitioner must show (1) that counsel's performance was deficient, and (2) that the deficiency prejudiced the defense.  *Id.* at 687.  It is beyond dispute that the *Strickland* standard, which predated Lundgren's trial, constitutes "clearly established Federal law, as determined by the Supreme Court of the United States." *See Williams v. Taylor*, 529 U.S. 362, 391 (2000).

### A.  Deficiency

The assistance of Lundgren's counsel was deficient based on the conduct of similarly situated counsel, the ABA guidelines for counsel in death penalty cases, and the availability of a mental health theory supporting an insanity defense.  To establish deficiency, the first element of the *Strickland* test, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.  One indicium of reasonableness is the conduct of other counsel in similar situations.  As discussed in section I.A. above, for over two

hundred years, defense counsel have almost uniformly presented the insanity defense in deific decree cases in numerous jurisdictions. Courts also look to the ABA standards for counsel in death penalty cases as "the guiding rules and standards to be used in defining the 'prevailing professional norms' in ineffective assistance cases." *Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th Cir. 2003) (citing *Wiggins v. Smith*, 539 U.S. 510, 524 (2003)). The 1989 ABA Guidelines for counsel in death penalty cases published over a year before Lundgren's trial exhort counsel to conduct investigations relating to the guilt phase, to explore the defendant's mental state, to collect information relevant to the defendant's mental history, and to secure the assistance of experts necessary for preparation of the defense. ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1, pp. 10-12 (1989). The "unique nature of the death penalty" intensifies this duty to investigate the case. *Id.*, commentary, p. 55. Similarly, the 2003 ABA Guidelines, which "merely represent a codification of longstanding, common-sense principles of representation understood by diligent, competent counsel in death penalty cases," *Hamblin*, 354 F.3d at 487, direct attorneys to investigate issues pertaining to guilt and penalty regardless of "overwhelming evidence of guilt." ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.7(A)(1), p. 76 (2003). The commentary to the Guidelines emphasizes that, "[i]n capital cases, the mental vulnerabilities of a large portion of the client population compound the possibilities for error" and that counsel has a duty "to investigate and re-investigate all possible defenses." *Id.*, commentary, p. 78. The 1989 ABA Guidelines further instruct counsel to formulate a defense theory and note that "[t]he possibility that the client will be sentenced to death increases the need to litigate potential issues at all levels." ABA Guidelines 11.7.1(A), p. 16 (1989); *id.* at 11.5.1, commentary, p. 59. The 2003 ABA Guidelines similarly counsel attorneys to "consider all legal claims potentially available," to "thoroughly investigate the basis for each potential claim," and to "be significantly more vigilant about litigating all potential issues at all levels in a capital case than in any other case." ABA Guidelines 10.8(1)-(2), p. 86 (2003); *id.* at 10.8, commentary, p. 89.

Not surprisingly, the failure to present the insanity defense in a deific decree case has been held to violate *Strickland*:

> It appears that a great deal of evidence of appellant's existing mental illness was available, and appellant's counsel failed in presenting his only defense to the jury for consideration . . .

> [I]n light of the tremendous amount of available defense evidence of insanity, and the inadequacy of the State's evidence to meet his burden, we cannot say appellant's trial was a true test of the adversarial process nor counsel's approach a reasonable fascimile of trial strategy . . .

> We find that appellant herein was denied an adequate defense . . . Without the benefit of the defense evidence, the fact that appellant simultaneously labored under the delusion that his acts were directed and authorized by God was not made known to the jury.

*Galloway v. State*, 698 P.2d 940, 941-42 (Okla. Crim. App. 1985). Other courts have concluded that a failure adequately to prepare and to present an insanity defense is ineffective where there are serious questions about the defendant's mental condition and no other plausible defense is available. *See Wood v. Zahradnick*, 578 F.2d 980, 982 (4th Cir. 1978); *United States v. Fessel*, 531 F.2d 1275, 1278-79 (5th Cir. 1976); *Brooks v. Texas*, 381 F.2d 619, 622, 625 (5th Cir. 1967); *Goodwin v. Swenson*, 287 F. Supp. 166, 167 (D. Mo. 1968); *People v. Jones*, 6 Mich. Law. Wkly. 1322 (Aug. 31, 1992) (summary of unreported decision of Michigan Court of Appeals); *cf. Alvord v. Wainwright*, 469 U.S. 956, 959 (1984) (Marshall, J., dissenting from denial of grant of *certiorari*) ("[C]ounsel had a duty to investigate his client's case and make a minimal effort to persuade him to follow the only plausible defense [the insanity defense]."); *Brennan v. Blankenship*, 472 F. Supp.

149, 157 (D. Va. 1979), *aff'd*, 624 F.2d 1093 (4th Cir. 1980) (counsel was ineffective in failing both to investigate defendant's case and to advise him as to the insanity defense, the only plausible defense in the case).

Our Court's decision in the instant case rightly quotes *Strickland*, 466 U.S. at 690-91, for the propositions that "counsel has a duty to make reasonable investigations" and that "[s]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Our Court concludes that Lundgren's trial counsel made a reasonable investigation because they hired two mental health experts, both of whom apparently were not willing to testify that Lundgren suffered from a mental illness of any severity. In a capital case, however, defense counsel's "duty to make reasonable investigations" into the mental health of an apparently deranged client does not begin and end with hiring two mental health professionals. Had Lundgren's counsel "investigated and re-investigated" Lundgren's mental condition, they would have uncovered the large body of psychiatric literature describing "delusional disorder" and its connection to religious delusions and cult leadership. Had Lundgren's counsel been "significantly more vigilant about litigating all potential issues," they would have discovered that almost all similarly situated counsel in the past two centuries have presented the insanity defense. The duty to investigate, to prepare, and to present the insanity defense was intensified not only because this is a death penalty case, but also because there simply was no other possible defense.

Our Court further states that, "[g]iven counsel's information at the time of trial," Lundgren's counsel was reasonable in declining to present the insanity defense. The state court's opinion denied relief under this same rationale. *See State v. Lundgren*, No. 97-L-110, 1998 WL 964592, at *6 (Ohio Ct. App. Dec. 18, 1998), *dismissed, appeal not allowed*, 709 N.E.2d 171 (Ohio 1999) ("[B]ased upon the information available to appellant's trial counsel, there was no basis for the entry of a plea of not guilty by reason of insanity."). It is little wonder that an unreasonable investigation produced little evidence to corroborate the defense.[8] The basic point is that, if Lundgren's counsel had conducted a reasonable investigation into Lundgren's mental health, they would have discovered sufficient evidence to do what virtually every other similarly situated counsel has done for over two centuries – present the insanity defense to the jury.

Our Court also remarks that the failure of Lundgren's counsel to present the insanity defense was a "reasonable strategic choice." Counsel, however, cannot make a strategic choice if he does not know what the law is. Lundgren's counsel undertook no comprehensive study of the law or mental health theories and, therefore, had insufficient information upon which to base a strategy. In lieu of making the obvious choice to investigate and to present their client's only possible defense, Lundgren's counsel conceded guilt in the opening statement and then opted "to hurry through the first stage of the murder trial" with few cross-examinations and without calling any witnesses to defend Lundgren. Pete Earley, *Prophet of Death: The Mormon Blood-Atonement Killings* 423, 425 (1991). By declining to present the insanity defense, Lundgren's counsel ensured that the trial focused only on the Averys' tragic deaths and rendered irrelevant any evidence of Lundgren's mental condition or of his religious rationale for the killings. *See Davis v. State*, 160 N.E. 473, 476 (Ohio 1928) ("It is not a defense to a prosecution . . . that the accused is a member

---

[8]One district court hypothesized the consequences of a failure to investigate in the celebrated trial of James Hadfield:

> Even the great Thomas Erskine would not have been able to obtain the acquittal of James Hadfield if he had not investigated the facts of that case . . . Erskine located thirty-two witnesses to prove, in the words of Lord Kenyon, the trial judge, that at the time Hadfield "committed this offense, and a most horrid one it was, he was in a very deranged state."

*Goodwin v. Swenson*, 287 F. Supp. 166, 183 n.11 (D. Mo. 1968).

of a religious society and that the representation made alleged to constitute the offense was a part of the religious belief of the alleged offender.").[9]  This conduct could hardly be described as anything but deficient.

## B. Prejudice

The failure of Lundgren's counsel to present the insanity defense was prejudicial because a complete and accurate presentation of Lundgren's mental condition could have resulted in a verdict of not guilty by reason of insanity as has occurred in some similar cases, or, at least, because such a portrayal could have spared Lundgren the death sentence at the penalty phase.  To establish prejudice, the second component of the *Strickland* standard, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  Lundgren must demonstrate that "counsel's errors were serious enough to deprive the petitioner of a proceeding the result of which was 'reliable.' "  *Glenn v. Tate*, 71 F.3d 1204, 1210 (6th Cir.1995).  Lundgren has sufficiently demonstrated that the failure of his counsel to present his only possible defense – the insanity defense – and to provide corroborating evidence, including expert testimony, "undermines confidence in the outcome" of his guilt and sentencing phases.

One court found prejudice in a deific decree case in which counsel failed to present the insanity defense:

> Had appellant's evidence of insanity been presented at trial, there is a substantial possibility that the State would have been unable to prove his sanity beyond a reasonable doubt.  Thus, the prejudice that appellant suffered from his counsel's deficiencies is obvious.

*Galloway v. State*, 698 P.2d 940, 942 (Okla. Crim. App. 1985).

That finding is not surprising in light of the insanity defense's occasional success in cases where the defendant claims that God commanded the killing.  A verdict of not guilty by reason of insanity has been entered in at least five deific decree cases within the last two decades.  In *State v. Hudson*, No. 01C01-9508-CC-00270, 1999 WL 77844, at *1 (Tenn. Crim. App. Feb. 19, 1999), the defendant shot her one-month-old nephew, believing that God had instructed her to kill "the son of Satan."  Two mental health experts testified that she suffered from delusional disorder, and another expert diagnosed her with major depressive disorder.  *Id.* at **3-4.  The Tennessee Court of Criminal Appeals vacated the jury verdict and remanded for entry of a judgment of not guilty by reason of insanity.  *Id.* at *8.  Similarly, in *People v. Wilhoite*, 592 N.E.2d 48, 50, 52 (Ill. App. Ct. 1991), Wilhoite followed God's "voice" when she shoved her nine-year-old daughter out of the eighth-story window of their apartment in order to pass "a test to see if [Wilhoite] could get into heaven" prior to the imminent end of the world.  Wilhoite was found not guilty by reason of insanity.  *Id.* at 58.  In *People v. Serravo*, 823 P.2d 128, 131 (Colo. 1992) (en banc), Serravo, professedly implementing God's instructions, stabbed his wife "in order to sever the marriage bond."  The jury found Serravo not guilty by reason of insanity.  *Id.* at 130. Likewise, a Colorado judge found a defendant not guilty by reason of insanity after professedly following God's direction to kill her husband in order to use his life insurance proceeds to help child victims of Mafia-produced pornography.  Karen Rouse,

---

[9]Courts have long distinguished between cases involving religious motivation and those professedly involving God's command to kill.  As Justice Cardozo stated, the insanity defense requires a showing of a mental disease or defect, a showing satisfied by a person suffering from "an insane delusion" that God commanded him to kill.  *People v. Schmidt*, 110 N.E. 945, 949-50 (N.Y. 1915).  On the other hand, a person who kills because of a religious belief but does not suffer from a mental disease or defect cannot establish insanity.  *Id.* at 950.

*Woman Is Ruled Insane in Killing*, Denver Post, Apr. 25, 2001, at B-01. Most recently, a jury found Deanna Laney innocent by reason of insanity after she stoned two of her young sons to death with heavy rocks purportedly in accordance with God's command. *Mom Who Killed Kids with Rocks Committed to Mental Hospital*, Chi. Trib., Apr. 7, 2004, at 8. The insanity defense has also benefitted defendants in other deific decree cases. *See* Richard Moran, *The Origin of Insanity as a Special Verdict: The Trial for Treason of James Hadfield (1800)*, 19 Law & Soc'y Rev. 487, 508 (1985) (British jury found defendant not guilty by reason of insanity following his attempted shooting of the king at the purported direction of God); Carol Delaney, *Abraham on Trial: The Social Legacy of Biblical Myth* 35, 66 (1998) (providing first-hand account of California jury's acquittal of defendant based on insanity defense in deific decree case); *People v. Sword*, 34 Cal. Rptr. 2d 810, 812 (Cal. Ct. App. 1994) (defendant found not guilty by reason of insanity and guilty of second degree murder after shooting and killing tenant in accordance with God's "command"); *People v. Hudec*, 213 Cal. Rptr. 184, 186, 189 (Cal. Ct. App. Apr. 29, 1985) (ordered not to be published by California Supreme Court) (defendant found not guilty by reason of insanity and guilty of voluntary manslaughter after killing his father professedly because God told him to do so).

In the instant capital case, where "death is different" and "doubts . . . should be resolved in favor of the accused," *DePew v. Anderson*, 311 F.3d 742, 751 (6th Cir. 2003) (quoting *Andres v. United States*, 333 U.S. 740, 752 (1948)), failing to present Lundgren's only possible defense – a defense with a track record of some success in similar cases – undermines confidence in the trial's outcome.

A further reason to find prejudice is the potential mitigating effect a proper presentation of Lundgren's mental condition could have had in the sentencing phase. "Under federal law, one juror may prevent the death penalty by finding that mitigating factors outweigh aggravating factors." *Hamblin v. Mitchell*, 354 F.3d 482, 493 (6th Cir. 2003). The prejudice prong is satisfied if "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 537 (2003). Had Lundgren's trial counsel effectively investigated his mental condition and presented an insanity defense to the jury, such a presentation would have given any juror a legal justification for declining to impose the death penalty. *Cf.* Delaney, *supra*, at 65-66 (account of jury deliberations in deific decree case resulting in verdict of not guilty by reason of insanity).

### C. Footnote 6 of the Court's Opinion

The problem with my colleagues' response in footnote 6 to my view is that it assumes that defense counsel had no obligation to do the legal research necessary to find the many similar cases that rely on the insanity defense in "deific decree" cases and to formulate a defense strategy with some chance of success. My colleagues also assume that defense counsel had no obligation to look into the psychiatric literature themselves in order to understand the theory of insanity that defense counsel used in all the other similar cases – in some of which the defense was successful.

This is an interesting and unusual case, both legally and psychologically; and one would think that defense counsel would feel the professional responsibility, as well as have enough natural curiosity to inquire themselves into the relevant legal and psychological literature. They obviously did not do any of this research or develop any legal theory that might have some prospect of avoiding the death chamber for their client. In my view that constitutes ineffective assistance of counsel, no matter how odious the crime or barbaric the murder.

Although my colleagues may be correct in pointing out that, in deific decree cases, the insanity defense is unsuccessful more often than it is successful, our Court downplays those instances of success by stating that "the defense has only been successful four times." My dissent, however, recounts seven instances of verdicts of not guilty by reason of insanity in such cases, most

of which occurred in the last two decades.  The number may well be much higher because "deific decree cases have also been resolved at the trial level . . . with insanity verdicts that were not appealable due to double jeopardy concerns."  *See* Morris & Haroun, *supra*, at 1011-12.  Moreover, in light of Ohio's definition of insanity that was then "more liberal to those accused of crime" than the traditional M'Naghten rule, *State v. Staten*, 247 N.E.2d 293, 295 (Ohio 1969), counsels' oversight was all the more egregious.

In addition, I am not convinced that polling a delusional defendant to determine whether he believes he is insane should be a primary factor in counsel's decision to pursue the only plausible defense in a capital case.  *See Brennan v. Blankenship*, 472 F. Supp. 149, 156 (D. Va. 1979), *aff'd*, 624 F.2d 1093 (4th Cir. 1980) ("Under any professional standard, it is improper for counsel to blindly rely on the statement of a criminal client whose reasoning abilities are highly suspect.").

## V. CONCLUSION

The failure of Lundgren's counsel to present the insanity defense was manifestly ineffective in light of the deific decree case law, the ABA's guidelines in death penalty cases, the availability of an applicable mental health theory, and the ensuing prejudice from trying a capital case without presenting the only plausible defense.  For the foregoing reasons, I dissent.